# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON, *et al.*,

     Plaintiffs,

     v.

RICHARD B. CHENEY, *et al.*,

     Defendants.

Civil Action No. 08-1548 (CKK)

## MEMORANDUM OPINION
(October 5, 2008)

Currently before the Court is a [23] Motion for Stay pending Petition for Writ of

Mandamus or, in the alternative, for a Protective Order, filed on September 30, 2008, by

Defendants, Vice President Richard B. Cheney in his official capacity, the Executive Office of

the President ("EOP"), the Office of the Vice President ("OVP"), the National Archives and

Records Administration ("NARA"), and Dr. Allen Weinstein, Archivist of the United States, in

his official capacity.  On October 1, 2008, Plaintiffs, Citizens for Responsibility and Ethics in

Washington and a number of individual historians, archivists, and organizations of archivists and

historians, filed an Opposition.  The Court also held a conference call on the record with counsel

for all parties on October 1, 2008, to further discuss the parties' arguments with respect to a

potential protective order and to suspend any scheduled depositions pending resolution of

Defendants' Motion for Stay and their Petition for Writ of Mandamus before the Court of

Appeals.

After considering the aforementioned submissions and the arguments presented during

the conference call, and after a thorough review of the applicable case law, statutory authority, and the record of the case as a whole, the Court shall DENY Defendant's Motion for Stay pending Petition for Writ of Mandamus, and shall GRANT Defendants' Motion for a Protective Order.

Defendants' Motion for Stay and their Petition for Writ of Mandamus contain content that bears no resemblance to what has actually transpired in this case.[1]  Defendants suggest that this Court either ignored or denied Defendants' jurisdictional arguments in favor of allowing Plaintiffs to take intrusive discovery concerning a wide-range of factual issues that are inappropriate for judicial review.  The truth is that Defendants have *never* – prior to the instant Motion – briefed the jurisdictional arguments that form the basis for their Motion for Stay.  To the contrary, Defendants made the decision to litigate this case *on the merits* by introducing various declarations into the record that gave rise to factual ambiguities and failed to resolve the legal questions presented in this case.  Defendants' arguments then shifted through several unexplained incarnations (reflected in several additional rounds of briefing), none of which resolved the factual and legal issues necessary to reach a disposition in this case.

The parties and the Court therefore reached an impasse – resolution of the legal questions in this case depended on discovery of discrete factual information within the knowledge of specific government officials.  Attempts to obtain the necessary factual information through briefing and written submissions to the Court failed.  Defendants' declarations served only to

---

[1] The Court recognizes that the Petition for Writ of Mandamus is before the Court of Appeals and not this Court, and has therefore reviewed it only in summary fashion.  However, it is clear that the same misstatements concerning the proceedings in this case contained in the Motion for Stay abound in the Petition for Writ of Mandamus.

confuse, rather than to clarify, Defendants' factual and legal positions.  The Court therefore granted Plaintiffs' request to take expedited and targeted discovery into six areas of inquiry that comply with the framework set forth in *Armstrong v. EOP*, 1 F.3d 1274, 1293-94 (D.C. Cir. 1993), which permits judicial review of classification decisions under the Presidential Records Act, 44 U.S.C. § 2201 *et seq.*  To alleviate any concerns that the two depositions authorized by the Court would stray into areas that are not permitted by *Armstrong*, the Court also subsequently ordered the parties to conduct their depositions in the Courthouse with a judicial officer available for any objections that might arise.  *See* 10/1/08 Conf. Call. Tr. at 5:1 - 5:3.

Only after the parties' briefing had reached this impasse did Defendants request to file a motion to dismiss on jurisdictional grounds.  Even when making this request, however, Defendants were remarkably unspecific about what jurisdictional grounds they would assert, and no such arguments had been briefed in any of their submissions to the Court.  Nevertheless, the Court expressly advised Defendants that they *could* raise any of their unspecified jurisdictional arguments in a motion to dismiss pursuant to the briefing schedule set by the Court, and that such jurisdictional arguments would be considered prior to reaching any merits arguments advanced by the parties.  Rather than comply with that schedule, it appears that Defendants have decided to develop their jurisdictional argument in the context of a Motion for Stay and a Petition for Writ of Mandamus.

The sole jurisdictional argument now developed by Defendants and presented to this Court–that the discovery allowed by the Court in this case runs afoul of the D.C. Circuit's decision in *Armstrong v. Bush*, 924 F.2d 282 (D.C. Cir. 1991)–fails on its merits.  *See* Defs.' Mot. for Stay at 1-2.  As explained *infra*, the D.C. Circuit expressly recognized in *Armstrong v.*

*EOP*, 1 F.3d 1274 (D.C. Cir. 1993), that district courts may review Presidential Records Act

classification decisions (and guidelines related thereto) of the sort that are at issue in this

litigation, and this Court is complying with the framework set forth by the D.C. Circuit's

*Armstrong* opinions.  In short, Defendants' Motion for Stay–and the jurisdictional argument

therein–are meritless.

## I. DISCUSSION

To avoid undue repetition, the Court shall incorporate by reference its exhaustive

recitation of the history of this case, which is set forth in the Court's Discovery Order.  *See* Order

at 5-18 (Sept. 24, 2008), Docket No. [20].  In brief, this case concerns the Presidential Records

Act ("PRA").  The PRA defines the term "Presidential records" as:

> documentary materials, or any reasonably segregable portion thereof, created or
> received by the President, his immediate staff, or a unit or individual of the
> Executive Office of the President whose function is to advise and assist the
> President, in the course of conducting activities which relate to or have an effect
> upon the carrying out of the constitutional, statutory, or other official or
> ceremonial duties of the President.

44 U.S.C. § 2201(2).  The PRA specifically directs that Vice-Presidential records are subject to

the provisions of the PRA "in the same manner as Presidential records," and provides that "[t]he

duties and responsibilities of the Vice President, with respect to Vice-Presidential records, shall

be the same as the duties and responsibilities of the President under [the PRA] with respect to

Presidential records."  *Id.* § 2207.  Significantly, the PRA does not contain any further definitions

of the terms "constitutional, statutory, or other official or ceremonial duties of the [Vice]

President" when defining Vice-Presidential records.  *See generally* 44 U.S.C. § 2201, *et seq.*

Plaintiffs' Amended Complaint alleges that Defendants have improperly and unlawfully

placed limitations on the scope of Vice-Presidential records subject to the PRA.  Am. Compl. ¶

1.  In particular, Plaintiffs allege that Vice President Cheney, the OVP, and the EOP have or will

"improperly and unlawfully exclude from the PRA records created and received by the vice

president in the course of conducting activities related to, or having an effect upon, the carrying

out of his constitutional, statutory, or other official [or] ceremonial duties."  *Id.*  Plaintiffs also

challenge the alleged "policies and practices" of the Archivist and NARA "to exclude from the

reach of the PRA those records that a vice president creates and receives in the performance of

his legislative functions and duties."  *Id.*

> Plaintiffs filed their initial Complaint on September 8, 2008, along with a Motion for

Preliminary Injunction.[2]  Defendants filed an Opposition to the Motion for Preliminary Injunction

on September 16, 2008, which did *not* oppose the Motion on jurisdictional grounds.  Rather,

Defendants asserted that

> The Vice President and the Office of Vice President ("OVP") have been carrying
> out since January 20, 2001–and intend to continue to carry out–their obligations
> under the Presidential Records Act with respect to documentary materials that
> relate to or have an effect upon the Vice President's constitutional, statutory or
> other official and ceremonial duties, both executive-related and legislative-related
> duties.

Defs.' Opp'n at 1.  Defendants supported their Opposition with Declarations filed by Claire M.

O'Donnell, Assistant to the Vice President and Deputy Chief of Staff, and Nancy Kegan Smith,

Director of the Presidential Materials Staff in the Office of Presidential Libraries at the National

Archives and Records Administration ("NARA").  *See id.*, Exs. 1 and 2.

> Ms. O'Donnell's Declaration gave rise to a key factual dispute in this case.  She first

---

[2] Plaintiffs filed an Amended Complaint on September 15, 2008.

defined the term "Vice-Presidential records" by referencing the definition of the term set forth in

the PRA (*i.e.*, Vice-Presidential records consist of documentary materials related to "the

constitutional, statutory, or other official or ceremonial duties of the Vice President"). *See*

O'Donnell Decl. ¶ 5.  Ms. O'Donnell then inexplicably included two "sub-definitions" that

narrowed the PRA's language, stating that "[t]he constitutional, statutory, or other official or

ceremonial duties of the Vice President include both the functions of the Vice President as

President of the Senate and the functions of the Vice President specially assigned to the Vice

President by the President in the discharge of executive duties and responsibilities." *Id.*  The

introduction of these two sub-definitions made it unclear whether Defendants were narrowing the

broad language of the PRA in a way that excluded documentary materials that legally should be

covered by the PRA.  The Court sought to clarify the ambiguity by inquiring of Defendants:

> Does this statement indicate that Defendants interpret the phrase "the
> constitutional, statutory, or other official or ceremonial duties of the Vice
> President" as exclusively encompassing "the functions of the Vice President as
> President of the Senate" and "the functions of the Vice President specially
> assigned to the Vice President by the President in the discharge of executive
> duties and responsibilities?"

Order at 1 (Sept. 17, 2008), Docket No. [12].

Defendants responded that "the short answer to the Court's question is yes."  *See* Defs.'

Resp. at 1.  Defendants' Response was supported by a second Declaration by Ms. O'Donnell, in

which she avers that

> all the constitutional, statutory, or other official or ceremonial duties of the Vice
> President fall within either (a) the category of functions of the Vice President
> specially assigned to the Vice President by the President in the discharge of
> executive duties and responsibilities or (b) the category of the functions of the
> Vice President as President of the Senate.

Suppl. O'Donnell Decl. ¶ 5.  She further avers that "[a] Vice President has no functions unless they are specially assigned to the Vice President by the President in the discharge of executive duties and responsibilities."  *Id.* ¶ 6.  Consistent with Defendants' previous submissions to the Court, Defendants' Response did not allude to any jurisdictional grounds for dismissal, and instead focused on potential factual disputes and the related legal questions in the record.

The Court issued an Order for a Preliminary Injunction on September 20, 2008.  *See* Order at 1-2 (Sept. 20, 2008), Docket No. [15].  The Court explained that "Defendants' Response to the Court's latest question makes unmistakably clear that Defendants apply a narrowing interpretation to [the language of the PRA]."  Mem. Op. at 11 (Sept. 20, 2008), Docket No. [16]. This conclusion was apparent because

> Defendants [] define the terms used in the PRA–the 'constitutional, statutory, or other official or ceremonial duties of the [Vice] President'–to include *only* those 'functions of the Vice President specially assigned to the Vice President by the President in the discharge of executive duties and responsibilities' and 'functions of the Vice President as President of the Senate.'

*Id.* at 11 (citing Suppl. O'Donnell Decl. ¶ 5; Defs.' Resp. at 1).  The Court further explained that Ms. O'Donnell's declarations stated the apparent legal conclusion that the PRA's definition of documentary materials was properly limited to the documentary materials falling under one of these two sub-definitions, but that the Declarations and Defendants' pleadings were "bereft of any legal analysis demonstrating that Defendants' interpretation [was] correct as a matter of law or any identification of legal authority that would allow Defendants to place limitations on the PRA's statutory language."  *Id.* at 12.  The Court also explained that Ms. O'Donnell's declarations and Defendants' pleadings gave rise to numerous factual questions, such as whether "Vice President Cheney *only* engages in activities that fall within the two narrow categories that

7

Defendants assert comprise all of his 'constitutional, statutory, or other official or ceremonial duties,'" *id.* at 12 (emphasis in original), and whether various examples of Vice Presidential activities that were proffered by Plaintiffs–including those based on the Vice President's statutory duties imposed by Congress–were considered by Defendants to fall within these narrow definitions.[3]  *Id.* at 14.

Defendants filed a Motion for Reconsideration of the Preliminary Injunction Order on September 23, 2008–a fact they wholly ignore in the instant Motion for Stay and their Petition for Writ of Mandamus–and attached a third Declaration by Ms. O'Donnell.  Similar to Defendants' previous submissions, the Motion for Reconsideration did *not* raise jurisdictional arguments.  Instead, the Motion reasserted Defendants' conclusion that the Vice President, "in performing his duties engages in the two categories of functions identified in the declarations and only in those categories," and that the OVP has applied the PRA "to the vice presidential records created or received in the course of engaging in those two functions."  Defs.' Mot. for Recons. at 3 (citing Second Suppl. Decl. of Ms. O'Donnell) (emphasis in original omitted).

Defendants' Motion for Reconsideration notably failed to provide any legal analysis supporting their position that the two sub-definitions were legally appropriate interpretations of the PRA's broad language, despite the Court's previous focus on the lack of such authority in its Memorandum Opinion accompanying the Preliminary Injunction Order.  *See* Mem. Op. at 12 (Sept. 20, 2008), Docket No. [16].  Defendants also failed to explain why their sub-definitions

---

[3] Defendants later attempted to shoehorn the Vice President's duties imposed by Congressional statute into the sub-definition "specially assigned to the Vice President by the President."  *See* 9/23/08 Conf. Call. Tr. at 19:25 - 20:2 ("The statutory functions . . . are subsumed and considered to be executive related functions").

were necessary or appropriate if Defendants believed that they were co-extensive with the broad

language of the PRA.  Although Defendants' Motion for Reconsideration explained that

Defendants were using the phrase "specially assigned by the President" based on language found

in 3 U.S.C. § 106, *see* Defs.' Mot. for Recons. at 5, the Court reviewed that statute and found that

it was a budgetary provision related to the Vice President's hiring and payment of staff, and not a

statute related to the classification of materials under the PRA.[4]  The seminal legal question in

the case therefore remained:  whether Defendants' interpretation of the PRA's language is

supported as a matter of law.  The factual disputes related to that question also remained, among

them whether Defendants are correctly classifying documentary materials by applying their

narrowing definitions of the PRA's language.

On the same day that Defendants filed their Motion for Reconsideration, the Court held a

conference call on the record with all parties participating.  During the call, Defendants decided

to introduce a new twist on their arguments.  Rather than argue that Ms. O'Donnell's sub-

definitions were legally justifiable (based on a budgetary provision or otherwise), Defendants

argued for the first time that the sub-definitions were actually created for purposes of this

litigation only, and that Defendants were not using these sub-definitions to classify documents

---

[4] The language that Defendants cite in 3 U.S.C. § 106 was added to that statute pursuant to an amendment on November 2, 1978.  *See* Pub. L. No. 95-570, § 106(a), 92 Stat. 2446 (codified as amended at 3 U.S.C. § 106).  The PRA was enacted two days later on November 4, 1978.  *See* Pub. L. 95-591, 92 Stat. 2523 (codified as amended at 44 U.S.C. § 2201 *et seq.*).  It is unclear to the Court why Congress would have used the phrase "specially assigned to the Vice President by the President" in the budget amendment and the phrase "statutory, ceremonial or other official duties" in the PRA if, as Defendants seem to be suggesting, those phrases were intended to have the same meaning.

under the PRA.[5]  *See* 9/23/08 Conf. Call Tr. at 19:10 - 19:14.  Defendants' new position raised

yet another set of questions.  First, as noted above, the Court's Memorandum Opinion

accompanying its Preliminary Injunction Order described the Court's observation that

Defendants had not offered any legal analysis supporting these sub-definitions.  *See* Mem. Op. at

12 (Sept. 20, 2008), Docket No. [16].  Instead of filing a Motion for Reconsideration indicating

that the definitions were created only for purposes of this litigation and that Defendants *were*

complying with the broad definition in the PRA, Defendants' Motion for Reconsideration

*reaffirmed* Defendants' reliance on, and application of, these two narrow definitions.  *See* Defs.'

Mot. for Recons. at 3 ("the Office of the Vice President has applied section 2207 to the vice

presidential records created or received in the course of engaging in those [two categories of]

functions").  Second, Defendants' new position that they created the sub-definitions for purposes

of this litigation appeared incongruous with Defendants' previous representations that the

definitions were derived from language in a budgetary provision.  *See* Defs.' Mot. for Recons. at

5 (citing 3 U.S.C. § 106).

    During the September 23, 2008 conference call, and after the Court described these issues

relating to Defendants' new argument, Defendants sought to shift course yet again and, instead of

relying on the factual arguments they had previously advanced, proposed that the Court permit

another round of briefing in connection with a Motion to Dismiss.  The Court rejected that

proposal because Defendants failed to explain what jurisdictional grounds they would pursue and

---

[5] Despite this argument, Defendants' counsel would not concede that these definitions did not exist prior to this litigation.  *See* Tr. 19:15 - 19:17 ("THE COURT: So, [the definitions] didn't exist [before the litigation]?  DEFENDANTS' COUNSEL: Well I can't say that they didn't exist beforehand").

how those grounds were unrelated to the factual disputes in the record that prevented the case from moving forward.  This lack of specificity was also reflected in Defendants' submissions to the Court, none of which had raised any jurisdictional arguments.[6]  The Court expressly advised Defendants that they could raise jurisdictional arguments in the parties' final round of briefing pursuant to a schedule set by the Court, and that the Court would consider jurisdictional arguments prior to reaching any merits arguments advanced by the parties.  *See* 9/23/08 Conf. Call Tr. at 26:14 - 28:6.

Having considered Defendants' multiple positions taken in the litigation,[7] as reflected in the several rounds of briefing and the four declarations submitted by Defendants, the Court also found that the parties' briefing had reached an impasse.  The Court was unable to resolve the parties' disputes one way or the other on the factual record presented to the Court and was therefore unable to reach a decision concerning the merits of the parties' legal arguments.  As the Court explained in its Discovery Order,

> [i]t may be the case that Defendants are, as they assert, complying with the broad language of the PRA.  It may also be the case that Defendants' shifting positions reflect narrow definitions that exclude certain documentary materials from the broad language of the PRA.  Defendants' approach has denied the Court the ability–and the factual record necessary–to decide one way or the other . . . .

---

[6] Defendants' Motion for Reconsideration does contain a brief argument concerning standing.  *See* Defs.' Mot. for Recons. at 8-9.  A review of that argument, however, reveals that it is predicated on Defendants' *ipse dixit* that Plaintiffs lack injury because Defendants are complying with the PRA.  This arguments requires a circular inquiry into whether, in fact, Defendants are complying with the PRA given their interpretation of it – the seminal question to be decided after clarification of the factual record.

[7] The Court notes that Defendants' first position was that there were a small subset of legislative records that Defendants were not treating as covered by the PRA and that formed the core issue in this case.  *See* 9/10/08 Conf. Call. Tr. at 5:14 - 5:18; 13:12 - 13:15.  Defendants' subsequent arguments omit any reference to these documents.

Discovery Order at 16 (Sept. 24, 2008), Docket No. [20].

The problems associated with proceeding without factual clarification were compounded by Plaintiffs' arguments that any decision issued after January 20, 2009–the date of the Vice-Presidential transition–risked the misplacement of documents that are potentially at issue in this litigation. *See* 9/10/08 Conf. Call. Tr. at 21:4 - 21:12. During the first conference call with the parties on September 10, 2008, the Court explained that, given the Court's November and December trial schedule, and given that the Complaint appeared to potentially involve complex issues of first impression, the parties would have to complete their briefing no later than November 17, 2008, to provide the Court with sufficient time to reach its decision prior to January 20, 2009. The parties agreed to an expedited briefing schedule consistent with the November 17, 2008 end date. *See* Discovery Order at 17 (Sept. 24, 2008), Docket No. [20]. Plaintiffs also raised during the parties' first conference call the specter that the existence of factual disputes would necessitate discovery and delay the parties' briefing schedule. *See* 9/10/08 Conf. Call Tr. at 8:1 - 8:3.

For all of these reasons, the Court asked the parties to submit a Status Report proposing an appropriate briefing schedule and addressing whether narrow and expedited discovery by one or more parties would have to be incorporated into that schedule. *See* Min. Order dated Sept. 22, 2008. Pursuant to the parties' Status Report, only Plaintiffs requested permission to take targeted and expedited discovery. *See* Status Report at 1-10 (Sept. 23, 2008). The Court granted Plaintiffs' request to depose two individuals–David Addington, the Vice President's Chief of Staff, and Nancy Kegan Smith, the Director of the Presidential Materials Staff in the Office of

Presidential Libraries at NARA–and incorporated a brief window for discovery prior to requiring the parties to file a final round of briefing.  *See* Discovery Order at 18 (Sept. 24, 2008), Docket No. [20].  The Court determined that these two depositions were necessary to resolve the factual and legal questions in the record that previous briefing had failed to clarify and without which the case could not move forward.

The Court also determined that these depositions were a more appropriate method for expedited discovery than written discovery because Defendants had already submitted four declarations that failed to resolve the factual and legal disputes in the record.  The depositions were likely to be completed more quickly than written discovery and would allow for follow up questioning to clarify any statements.  The Court also found that the discovery was necessary to resolve both Defendants' Motion for Reconsideration of the Court's Preliminary Injunction Order, as well as the parties' competing merits arguments concerning Defendants' interpretation of the PRA.[8]  Defendants asked the Court to provide guidance on the scope of discovery, which the Court provided in its Discovery Order issued on September 24, 2008.  *See* Discovery Order at 18-19 (Sept. 24, 2008), Docket No. [20].

## II.  LEGAL ANALYSIS

A.       *Motion for Stay Pending Writ of Mandamus*

The factors the Court considers in determining whether a stay pending petition for writ of mandamus is warranted are the same as a stay pending appeal:  (1) the likelihood that the party seeking the stay will prevail on the merits of the petition; (2) the likelihood that the moving party

---

[8] The Court instructed the parties to roll the briefing related to the Motion for Reconsideration into the final round of briefing ordered by the Court.

will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the Court

grants the stay; and (4) the public interest in granting the stay.  *See Cuomo v. U.S. Nuclear*

*Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985) (citing *WMATA v. Holiday Tours, Inc.*,

559 F.2d 841, 843 (D.C. Cir. 1977)).

> 1.   <u>Defendants have no likelihood of prevailing on the merits of their Petition
> for Writ of Mandamus</u>

Defendants' Motion for Stay is based primarily on the D.C. Circuit's decision in

*Armstrong v. Bush*, 924 F.2d 282 (D.C. Cir. 1991) (*Armstrong I*), ignoring almost entirely the

D.C. Circuit's decision in *Armstrong v. EOP*, 1 F.3d 1274 (D.C. Cir. 1993) (*Armstrong II*).  That

omission is significant because the *Armstrong II* panel discussed at length the reach of the

decision issued in *Armstrong I*, and the decision issued in *Armstrong II* bears directly on the

issues presented in the instant Motion and Defendants' Petition for Writ of Mandamus.

Although Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction cited

*Armstrong I* twice in passing, *see* Defs.' Opp'n at 16, 18, Defendants did not rely on *Armstrong I*

to argue that the Court lacked jurisdiction over Plaintiffs' claims.[9]  Nevertheless, in deciding

Plaintiffs' Motion for Preliminary Injunction, the Court needed to satisfy itself that it could

properly exercise jurisdiction over Plaintiffs' claims despite Defendants' decision not to advance

any jurisdictional arguments to the contrary.  The Court, therefore, reviewed *Armstrong I* and *II*

and found that the core issue raised by Plaintiffs' Amended Complaint–defined by the Court as

---

[9] Defendants' two citations referenced the uncontroversial proposition that Plaintiffs
could not succeed on any claims related to Defendants' general PRA compliance (*i.e.*, creation,
management, and disposal of records).  Because Plaintiffs' claims do not relate to general PRA
compliance, these two citations were immaterial.  Defendants did not refer to *Armstrong I* again
until the instant Motion for Stay.

"whether Defendants' narrowing interpretation of the PRA's language is supported, as a matter

of law," *see* Mem. Op. at 11 (Sept. 20, 2008), Docket No. [16]–was judicially reviewable.

Because Defendants did not challenge Plaintiffs' Motion for a Preliminary Injunction on

jurisdictional grounds, and because the parties had not fully briefed any issues concerning

*Armstrong I* or *II*, the Court simply noted its finding without extensive discussion:

> The Court notes that Plaintiffs' Motion for Preliminary Injunction argues that
> Defendants' construction of the PRA's language is judicially reviewable, *see* Pls.'
> Mot. for PI at 16-21, and Defendants have not challenged that assertion, *see
> generally* Defs.' Opp'n and Resp.  On this undeveloped record, the Court simply
> acknowledges that the D.C. Circuit's decision in *Armstrong v. EOP*, 1 F.3d 1274
> (D.C. Cir. 1993), recognizes that there are decisions regarding the classification of
> records in connection with the PRA that are reviewable by courts.

Mem. Op. at 15 n.3 (Sept. 20, 2008), Docket No. [16].

The central reason why Defendants have no likelihood of succeeding on the merits of

their Petition is that this Court recognizes and agrees that the *Armstrong* opinions control the

scope of discovery in this case – just as the Court previously indicated that *Armstrong II* controls

the extent of the Court's jurisdiction.  *Id.*  In particular, the D.C. Circuit has explained that "[t]he

*Armstrong I* opinion addressed the question [of] whether the courts could review the decision to

erase materials designated by the government as presidential records within the meaning of the

PRA."  1 F.3d at 1293.  The D.C. Circuit found that this decision was not judicially reviewable

because the PRA "precludes judicial review of the President's decisions concerning the creation,

management, and disposal of presidential records during his term of office."  *Id.* at 1294.

*Armstrong II* clarified, however, that "[t]he *Armstrong I* opinion does not stand for the

unequivocal proposition that all decisions made pursuant to the PRA are immune from judicial

review."  *Id.* at 1293.  Rather, the PRA permits review of issues associated with the "initial

15

classification of materials," which also permits review of "guidelines describing which existing materials will be treated as presidential records in the first place . . . ."  *Id.* at 1294 (emphasis in original omitted).

The core issues in this case concern Defendants' interpretations of the PRA's language that defines Vice Presidential records as those relating to his "constitutional, statutory, or other official or ceremonial duties of the President."  An area of inquiry that falls squarely within the classification decisions identified in *Armstrong II* as judicially reviewable is whether Defendants have properly interpreted this language by using the two sub-definitions included in Ms. O'Donnell's declarations and in counsel's various representations.  The six areas of inquiry identified by the Court in its Discovery Order were crafted to resolve the parties' specific factual, legal, or hybrid factual/legal disputes concerning these core classification issues:

> 1. The interpretation and application of the PRA by any Defendant, and any policies or record keeping practices related thereto or derived therefrom.
>
> 2. The existence, and any Defendant's custody or control of, individual records or categories of records that are or are not covered by the PRA, including but not limited to documentary material in the possession, custody or control of the Vice President, including records in his Senate office.
>
> 3. The functions of the Vice President that have generated, or that could generate, documentary materials covered or not covered by the PRA, including but not limited to any functions that are not "specially assigned" by the President.
>
> 4. The documentary materials that NARA has received or has not received from Defendants.
>
> 5. The interactions between any Defendant and NARA, which includes communications to or from employees working within the office of any named non-individual Defendant, concerning documentary materials covered or not covered by the PRA.
>
> 6. The basis for the knowledge of any deponent or Claire M. O'Donnell.

16

*See* Discovery Order at 18-19 (Sept. 24, 2008), Docket No. [20].  The Court's expectation in crafting these areas of inquiry was that Plaintiffs' deposition questions would remain appropriately cabined to areas addressing "classification decisions" and would not stray into any impermissible "creation, management, and disposal" decisions.  To ensure the same, the Court has ordered the parties to conduct the two depositions in the Courthouse with a judicial officer available to address any objections that may arise.  *See* 10/1/08 Conf. Call. Tr. at 5:1 - 5:3.

Defendants' Motion for Stay fails to explain how each of these six areas of inquiry violates *Armstrong II*.  On the contrary, Defendants' Motion merely seizes on the phrase "record keeping practices" in the first identified area of inquiry and argues that the Court has consequently authorized questioning into "records management practices" and the "day-to-day functioning of the Vice Presidency."  Defs.' Mot. for Stay at 2.  *See also id.* at 4 (arguing that the Court's Discovery Order permits questioning into "records management practices" and "records creation, management and disposal decisions" in violation of *Armstrong I*).  Defendants' argument is disingenuous.  Quite simply, this case is about Defendants' classification decisions. The discovery is directed to the same.  The Court did not use in its Discovery Order the phrase "records management practices," but rather used the phrase "record keeping practices" as it relates to Defendants' "interpretation and application of the PRA," and which may be reflected in any policies, practices, or guidelines.  *Armstrong II* specifically advised that "guidelines outlining what is, and what is not, a 'presidential record'" is an appropriate area for judicial review. *Armstrong II*, 1 F.3d at 1294.  Defendants' argument (i) ignores the immediately preceding phrase "interpretation and application of the PRA by any Defendant," which provides the necessary context for "record keeping practices," and (ii) divorces that phrase from the context

17

provided by the issues warranting discovery in this litigation. Defendants' argument also ignores the five *other* areas of inquiry identified by the Court, none of which is claimed in Defendants' Motion to be an impermissible area of inquiry under *Armstrong II*.

Defendants' Motion also argues that the Court's Discovery Orders violate "the well-settled rule that high-ranking federal officials may not be involuntarily deposed absent extraordinary circumstances." Defs.' Mot. at 5. The Court disagrees. Nancy Kegan Smith is the Director of the Presidential Materials Staff in the Office of the Presidential Libraries at NARA. She is not the sort of cabinet-level officer over which the D.C. Circuit's decisions contemplate protection from discovery. *See, e.g.*, *Peoples v. United States Dep't of Agriculture*, 427 F.2d 561, 567 (D.C. Cir. 1970) ("subjecting a cabinet officer to oral deposition is not normally countenanced"). Moreover, Defendants previously submitted a declaration from Ms. Smith with their Opposition to Plaintiffs' Motion for a Preliminary Injunction, thereby conceding the relevance of her testimony. *See* Defs.' Opp'n to Pls.' Mot. for PI, Ex. 2. Although David Addington is certainly a senior advisor to the Vice President in his position as Chief of Staff, he is not a cabinet-level officer, and he is uniquely qualified to address the areas of inquiry identified as appropriate for discovery in this case. *See* 9/23/08 Conf. Call. Tr. at 32:10 - 34:5. *Cf. Simplex Time Recorder Co. v. Sec'y of Labor*, 766 F.2d 575, 586 (D.C. Cir. 1985) (affirming an Administrative Law Judge's refusal to allow the plaintiff to call top Department of Labor officials as witnesses where, unlike here, the "information in the possession of these officials . . . could . . . [be] obtain[ed] from published reports and available agency documents"). Although Defendants have submitted three declarations from Ms. O'Donnell, the Vice President's Deputy Chief of Staff, the Declarations have failed to resolve the factual disputes and legal questions in

18

the record.  Mr. Addington appears to be the most appropriate deponent to answer questions

concerning the six areas of inquiry identified by the Court, and the fact that Defendants have

submitted the declarations of Mr. Addington's deputy in an unsuccessful attempt to resolve the

issues in this case also serves as a concession of the relevance of Mr. Addington's testimony.

2.     Defendants will not suffer irreparable harm absent a stay

Defendants offer two reasons as to why they will suffer irreparable harm absent a stay.

First, Defendants argue that the Court is running "headlong" into a separation of powers issue as

reflected in *Armstrong I* and in *Cheney v. United States Dist. Court for the Dist. of Columbia*,

542 U.S. 367, 385 (2004).  *See* Defs.' Mot. for Stay at 6.  That argument is specious.  The Court

is running on ground that has already been cleared by the D.C. Circuit in *Armstrong II*, where the

Court explicitly held that "[t]he *Armstrong I* opinion does not stand for the unequivocal

proposition that all decisions made pursuant to the PRA are immune from judicial review."

*Armstrong II*, 1 F.3d at 1293.  The *Cheney* decision also explains why separation of powers

issues are not implicated in this case.  In *Cheney*, the D.C. Circuit denied a petition for writ of

mandamus to modify or dissolve discovery orders that, "by virtue of their overbreadth, [] might

interfere with [] officials in the discharge of their duties and impinge upon the president's

constitutional prerogatives."  *Cheney*, 542 U.S. at 372.  The United States Supreme Court

vacated and remanded that decision due to separation of powers concerns because, as the D.C.

Circuit had acknowledged, "the discovery requests [were] anything but appropriate" and they

asked "for everything under the sky."  542 U.S. at 387-88.  The Supreme Court specifically

distinguished that type of inappropriately broad inquiry with more narrow discovery requests that

would "safeguard against unnecessary intrusion into the operation of the Office of the President."

19

*Id.* at 387.  In this case, the scope discovery has been set forth by the Court in six identified areas

of inquiry based on the factual disputes created by Defendants' Declarations and representations

to the Court, which concern the types of classification decisions that are judicially reviewable as

explained in *Armstrong II*.  *See* Discovery Order at 18-19 (Sept. 24, 2008), Docket No. [20].  The

Court has further ordered that Plaintiffs' two authorized depositions occur in the Courthouse with

a judicial officer available to address any objections, including those concerning the scope of

discovery.  Accordingly, the separation of powers concerns described in *Cheney* are simply not

implicated in this case.

The Court also notes that, in *Cheney*, the government defendants had raised the issue of

separation of powers before the district court, 542 U.S. at 375, and had also objected to the scope

of discovery to no avail, *id.* at 388.  Defendants have done neither in this case.  Specifically,

Defendants have *never* raised separation of powers concerns in any briefs submitted to this Court

prior to the instant Motion for Stay, and rather than raising any objections to the six areas of

inquiry identified in the Court's Discovery Order, Defendants have inappropriately decided to

develop such objections in the first instance through a Petition for Writ of Mandamus.  In any

event, for the reasons explained above, Defendants are incorrect in their assertions that there are

separation of powers issues that this Court is, as Defendants argue, running into "headlong."

Defendants' second argument is that the Court has violated the "well-established practice

of staying discovery before the anticipated filing of, and during the pendency of, a dispositive

motion."  Defs.' Mot. at 6.  This argument fails to acknowledge what has transpired in this case.

Defendants never previously raised the jurisdictional arguments that now form the basis for their

Motion for Stay.  To the contrary, Defendants made the decision to litigate this case on the merits

by introducing various declarations into the record that gave rise to factual ambiguities and failed to resolve the legal questions presented in this case.  Attempts to obtain the necessary factual information through briefing and written submissions to the Court failed.  The Court therefore granted Plaintiffs' request to take expedited and targeted discovery into six areas of inquiry that comply with the framework set forth in *Armstrong II*.

Defendants' argument also ignores the time limitations discussed by the Court during the first conference call with the parties.  During that call, the Court explained that, given the Court's November and December trial schedule, and given that the Complaint appeared to potentially involve complex issues of first impression, the parties would have to complete their briefing no later than November 17, 2008, to provide the Court with sufficient time to reach its decision prior to January 20, 2009 (the Vice-Presidential transition date).  *See* 9/10/08 Conf. Call. Tr. at 32:22 - 33:6; 36:2 - 36:15.  The parties agreed to an expedited briefing schedule consistent with the November 17, 2008 end date.  *Id.* at 36:18 - 37:21.  Defendants' decision to raise merits arguments, rather than unspecified jurisdictional arguments, resulted in numerous rounds of briefing that failed to resolve the case.  Other than the jurisdictional argument raised in their present Motion for Stay based on *Armstrong I*, which as discussed above is premised on the faulty ground that there is no jurisdictional review of decisions or guidelines associated with the PRA, Defendants have still not proffered other substantive jurisdictional arguments.  Therefore, Defendants' assertion that the Court should have waited for Defendants to divine a jurisdictional argument so that they could file a Motion to Dismiss prior to moving the case forward, particularly given the time constraints at issue, is as unreasonable as it is illogical.

3.      Plaintiffs may suffer prejudice if a stay is granted

Defendants first argue that Plaintiffs "would not be prejudiced by any delay to discovery"
because "they raise no claims upon which relief may be granted or over which the district court
could appropriately assert jurisdiction." Defs.' Mot. for Stay at 6-7. The first part of this
argument simply assumes Defendants' position is legally correct, which is yet to be proven. As
the Court's Discovery Order explained, the Court is unable to resolve the parties' disputes one
way or the other on the present record. Order at 16 (Sept. 24, 2008), Docket No. [20]. The
second part of Defendants' argument simply ignores *Armstrong II* and the D.C. Circuit's holding
that classification decisions under the PRA are judicially reviewable. *Armstrong II*, 1 F.3d at
1293-94.

Defendants next argue that delay would not cause substantial harm because the Court has
issued a preliminary injunction, "atop" representations that Defendants are complying with the
PRA (according to their interpretation of it). Defs.' Mot. for Stay at 7. This argument ignores
the fact that Defendants have filed a Motion for Reconsideration of the Preliminary Injunction
Order. Defendants' representations also fail to provide Plaintiffs with the necessary protections
against possible harm, as they are intertwined with Defendants' interpretation of what is required
under the PRA – the seminal legal question to be answered in this case.

Finally, Defendants argue that any harm suffered by Plaintiffs would not outweigh the
harm that Defendants incur by "onerous discovery demands." *Id.* at 7. The Court rejects
Defendants' characterization. The Court has authorized two depositions involving deponents
who unquestionably have relevant testimony and who will be answering questions that have been
cabined by the Court's issuance of a Discovery Order. This discovery is as narrow and targeted

22

as practicable under the circumstances of this case.[10]

In contrast to Defendants' arguments, Plaintiffs are correct that any delay risks serious prejudice by (potentially) preventing resolution of the issues in this case until after the January 20, 2009 Vice-Presidential transition. Plaintiffs assert that this transition makes it "far from certain what will happen to the records that the vice president himself retains." Pls.' Opp'n to Defs.' Mot. for Stay at 9. Contemplating precisely these types of concerns, the parties agreed on their first conference call with the Court to comply with a schedule that would allow the resolution of the case prior to the January 20, 2009 transition date. Should the issues in this case remain unresolved beyond that date, there is a heightened risk that documents potentially at issue in this litigation may be misplaced.

### 4. The public interest is not served by granting a stay

Defendants argue that the public interest is served by granting a stay because it would potentially avoid separation of powers issues. The Court has already rejected that argument above. *See* Section II.B.2, *supra*. The Court finds that the public interest favors resolving this case prior to January 20, 2009. The Court does not know at this point, one way or the other, whether Defendants are properly classifying records pursuant to the language of the PRA. If they are not, the public interest is clearly served by resolving this case prior to January 20, 2009, to ensure to the greatest extent possible the "preservation of an accurate and complete historical record." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 453 n.14 (1977) (quoting *Nixon v. Adm'r*

---

[10] To the extent Defendants view the areas of inquiry as inappropriate because they relate to decisions of the Vice President or the other Defendants, Plaintiffs appropriately observe that the PRA concerns Vice-Presidential records, and judicial review of classification decisions necessarily requires an inquiry into the classification decisions of the Vice President or the other Defendants. *See* Pls.' Opp'n to Defs.' Mot. for Stay at 7.

*of Gen. Servs.*, 408 F. Supp. 321, 348-49 (D.D.C. 1976)).

For all of these reasons, the Court shall deny Defendants' Motion for Stay pending the Petition for Writ of Mandamus.

   B.     *Motion for a Protective Order*

In the alternative, Defendants ask the Court to issue a Protective Order prohibiting Plaintiffs from videotaping the depositions of Ms. Smith and Mr. Addington.[11]  Defs.' Mot. for Stay at 8-12.  Defendants have not asked the Court to place any additional conditions or limitations on the manner in which the depositions are conducted, and have specifically informed the Court that they are not requesting that either deposition be sealed or that public access to the deponents' testimonies be otherwise limited.  *Id*. at 9-12.  *See also* 10/01/08 Conf. Call Tr. at 11:19 - 11:21 ("[w]e're not suggesting here that the transcripts or the information that is learned at the deposition cannot be made public. . . .").

As discussed above, the situation currently before the Court is unusual.  Plaintiffs allege that Defendants have improperly excluded records from the PRA, and seek declaratory, injunctive and mandamus relief based on those allegations.  Am. Compl. ¶ 1.  Ordinarily, resolution of this type of claim as a matter of law would not require the parties to engage in factual discovery.  Defendants have, however, by their own Declarations and representations created questions as to the factual and legal predicates underlying their narrow definitions

---

[11] Defendants' Motion also requested, and Plaintiffs agreed during the October 1, 2008 conference call on the record with the Court, to conduct the two depositions in the courthouse with a judicial officer available to address any objections that may arise.  *See* 10/1/08 Conf. Call Tr. at 5:1 - 5:3.  *See also* Pls.' Opp'n to Defs.' Mot. for Stay at 8.  Consistent with the Parties' mutual agreement, the Court ordered the parties to conduct both depositions at the courthouse under those conditions.

associated with classification of records under the PRA.  Resolution of these questions depends

on discrete factual information in the hands of specific government officials.  Attempts to obtain

the necessary factual information through briefing and written submissions to the Court have

failed.  For these reasons, among others stated above, the Court granted Plaintiffs' request to take

narrow and expedited discovery by deposing Ms. Smith and Mr. Addington.

The court-ordered discovery in this case is thus of an unusual nature, designed to

expeditiously clarify discrete factual questions that are necessary to resolve the narrow legal issue

presented to the Court.  Questions concerning the manner in which the depositions are to be

conducted must be considered within this unique context.  Federal Rule of Civil Procedure

30(b)(3) provides that, as a matter of ordinary course, the party noticing a deposition is

automatically permitted to videotape the deposition, *unless the court orders otherwise*.  Fed. R.

Civ. P. 30(b)(3) (emphasis added).[12]  The liberalization of the Federal Rules to permit

videotaping of depositions without prior authorization of the courts reflects "recognition of the

fact that videotapes are a means of presenting deposition testimony to juries that is superior to

readings from cold, printed records."  *Paisley Park Enters., Inc. v. Uptown Prods.*, 54 F. Supp.

2d 347, 349  (S.D.N.Y. 1999).  A videotaped deposition also has the advantage of "conveying to

the fact finder the full message of the witness in a manner that assists the fact finder in assessing

credibility . . . ."  *Riley v. Murdock*, 156 F.R.D. 130, 131 (E.D.N.C. 1994).

The normal advantages of videotaping depositions are not, however, implicated in this

case.  Rather, the Court granted limited discovery to resolve the factual and legal predicates for

---

[12]Federal Rule of Civil Procedure 30(b)(2) was amended in 1993 to "authorize[] [the parties] to record deposition testimony by nonstenographic means without first having to obtain permission of the court or agreement from other counsel."  Adv. Notes to Fed. R. Civ. P. 30.

Defendants' narrow definitions associated with application of the PRA.  Resolution of these

issues does not involve the presentation of deposition testimony to a jury or require a fact-finder

to weigh the credibility of competing witnesses, *i.e.,* the situations in which videotaped

depositions are typically helpful.  Instead, the Court's order granting Plaintiffs' request to take

narrow, expedited discovery is based on the unusual situation now before the Court, a situation

that does not implicate the normal benefits conferred by videotaped depositions.  Put simply,

being able to watch videotaped depositions will not assist the Court in resolving the discrete legal

issues before it.  This case therefore proves the exception to the rule.  Although Rule 30(b)

contemplates that, as a matter of ordinary course, parties may videotape depositions, the limited

discovery at issue here is not a matter of ordinary course.  The Court finds in its discretion that

permitting Plaintiffs to videotape the deposition testimony of Ms. Smith and Mr. Addington will

not assist the Court in resolution of the discrete legal questions at hand, and the Court therefore

orders that these two depositions shall not be videotaped.

### III.  CONCLUSION

For the reasons set forth above, the Court shall DENY Defendants' Motion for Stay

pending Petition for Writ of Mandamus, and shall GRANT Defendants' Motion for a Protective

Order.  An appropriate Order accompanies this Memorandum Opinion.


Date: October 5, 2008


                              /s/
                              **COLLEEN KOLLAR-KOTELLY**
                              United States District Judge