**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CITIZENS FOR RESPONSIBILITY AND :
ETHICS IN WASHINGTON, et al.,          :
                                                        :
                        Plaintiffs,              :
                                                        :
            v.                                        :            Civil Action No. 08-1548 (CKK)
                                                        :
THE HON. RICHARD B. CHENEY, et al., :
                                                        :
                        Defendants.           :
_____ :

**PLAINTIFFS' MOTION FOR LEAVE TO DEPOSE DAVID ADDINGTON**
**AND RE-DEPOSE NANCY KEGAN SMITH**
**AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**

**INTRODUCTION**

This Court authorized discovery to resolve the significant factual, legal and hybrid

factual/legal questions raised by defendants' declarations and pleadings in opposition to

plaintiffs' motion for a preliminary injunction.  These questions were generated in large part by

defendants' insistence on a facially narrow and under-inclusive definition of those functions and

duties the vice president performs that result in the creation of vice presidential records under the

Presidential Records Act ("PRA").  Defendants refused to reformulate their unduly narrow

definition in the face of the Court's continuing questions and concerns, even though the lack of

any factual or legal predicate made it impossible for the Court to determine whether defendants

are improperly excluding records from the reach of the PRA.

Specific questions raised by defendants' submissions include "whether 'Vice President

Cheney *only* engages in activities that fall within the two narrow categories that Defendants

assert comprise all of his 'constitutional, statutory, or other official or ceremonial duties,'" and

"whether various examples of Vice Presidential activities that were proffered by Plaintiffs . . .

were considered by Defendants to fall within these narrow definitions."  Discovery Order, September 24, 2008 (Dkt. 20), p. 12 (citations omitted) (emphasis added).  To answer these questions the Court authorized plaintiffs to take the depositions of National Archives and Records Administration ("NARA") official Nancy Kegan Smith and Claire M. O'Donnell, deputy chief of staff and assistant to the vice president.[1]

The deposition of Claire O'Donnell did not answer the Court's questions, did not shed light on the derivation, meaning or intent of defendants' narrow definition of those functions the vice president performs that create vice presidential records and, most significantly, reveals that Ms. O'Donnell is not a competent witness to speak to these issues.  Despite her impressive title, Ms. O'Donnell has no more expertise in or experience with vice presidential records than any other employee of the Office of the Vice President ("OVP").  Nor does Ms. O'Donnell have any personal knowledge about the vast majority of records and categories of records the vice president and the OVP create and receive, beyond the very limited categories of administrative records she personally manages.  Far from an expert on the OVP's implementation of the PRA, Ms. O'Donnell has not even read the Act in its entirety and has received no specific training or guidance beyond that given to all OVP employees.  Her declarations, as she readily admitted, were drafted by counsel and reflect counsel's choice of language, not hers.

Quite simply the stakes in this litigation are too high -- literally part of our nation's written history hangs in the balance -- to leave the Court's questions, which go to the heart of

---

[1] The Court initially authorized the deposition of Vice President Chief of Staff David Addington but the D.C. Circuit, ruling on defendants' mandamus petition, found that "Plaintiffs have *so far* shown no need for the deposition of such a high-ranking member of the Office of the Vice President."  In re Richard B. Cheney, Opinion, October 31, 2008, at p. 5 ("Mandamus Op.") (emphasis added).

this matter, unanswered.  The Court could, of course, entertain a round of briefing during which defendants try once again to convince the Court that black is white and up is down.  But the need to resolve this litigation quickly, before the administration comes to a close, compels the conclusion that the most expeditious course is to allow plaintiffs to depose David Addington. Unlike the record before the D.C. Circuit when it resolved defendants' mandamus petition, the current record makes it manifestly clear that Mr. Addington is a pivotal person in the management of the vice president's records under the PRA and, unlike Claire O'Donnell, is the most knowledgeable deponent to answer the Court's questions.  Accordingly, plaintiffs seek leave to depose Mr. Addington as quickly as possible.

In addition, plaintiffs seek leave to re-depose Nancy Kegan Smith on the subject of a memorandum issued recently by White House Counsel Fred Fielding or, alternatively request that the Court order defendants to produce this memorandum to plaintiffs.  Because of defendants' privilege assertion over the entire subject-matter of this memorandum, plaintiffs were unable to receive information about its contents.  The Court having now ruled that the memorandum is both within the scope of discovery and not privileged, plaintiffs should be afforded appropriate follow-up with Ms. Smith.

## **ARGUMENT**

### **I.  CLAIRE O'DONNELL IS NOT A COMPETENT WITNESS TO ANSWER THE COURT'S QUESTIONS.**

As set forth in the Court's Discovery Order and ratified by the D.C. Circuit, the purpose of the Court-authorized discovery was "to allow follow-up questioning on facts OVP has

itself put in evidence,"[2] such as "whether 'Vice President Cheney *only* engages in activities that fall within the two narrow categories that Defendants assert comprise all of his 'constitutional, statutory, or other official or ceremonial duties,'" and "whether various examples of Vice Presidential activities that were proffered by Plaintiffs . . . were considered by Defendants to fall within these narrow definitions."  Discovery Order, September 24, 2008 (Dkt. 20), p. 12 (citations omitted) (emphasis added).  Notwithstanding her title as deputy chief of staff and assistant to the vice president, Ms. O'Donnell lacks both knowledge and expertise to answer these questions.  Moreover, her deposition testimony reveals that she was not a competent witness to testify to the matters contained in the three declarations she has already submitted in this lawsuit.

First, Ms. O'Donnell essentially serves as an office manager in an administrative office of the OVP, with responsibility

> to hire staff, get them on board, get them office space, get them their passes, parking, just help with the personnel and the management of the office.

Deposition of Claire M. O'Donnell at p. 7 ("O'Donnell Depo.").[3]  Although she has some responsibility for records management within the OVP,[4] it is limited to managing her own files[5] and referring OVP employees with records management questions to the counsel to the vice president.  Id. at 11.

---

[2] Mandamus Op. at 5.

[3] For the Court's convenience plaintiffs include as Exhibit 1 to this Motion the entire transcript of Ms. O'Donnell's deposition.

[4] Id.

[5] Id. at pp. 14, 16 ("I only manage my own files"),18.

Ms. O'Donnell has personal knowledge of only five subsets or categories of records:  the four that she personally maintains and the records generated by the energy task force that Vice President Cheney headed up.  The four categories of records that Ms. O'Donnell maintains and that fall within the scope of the PRA are personnel records, which include resumes and clearance information;[6]  budget files relating to the vice president's "authorized budget" (e.g., "how we spend it . . . any kinds of bills");[7] the vice president's trip files with records concerning "who traveled with him, what rental cars we paid for, per diem, things like that";[8] and a file of bills paid, which includes "payroll bills . . . supplies . . . transportation of things within the office, travel bills."[9]  Ms. O'Donnell also has personal knowledge of records relating to the energy task force because those records were housed in her office space, O'Donnell Depo. at 49-50, and at that early stage of the administration she had "more hands on . . . to make sure that things were being done" and was assigned personal responsibility for these records  Id. at 50.

In implementing these limited records management responsibilities Ms. O'Donnell has received equally limited guidance and instruction.  She recalled having received only two written memoranda, each from the then-White House counsel and each directed to all staff.  The first memorandum, issued in January 2001, "didn't apply just to the vice president.  It applied to everybody."  O'Donnell Depo. at 9.  Ms. O'Donnell could not recall what, if any specific

---

[6] O'Donnell Depo. at p. 14.

[7] Id. at 15.

[8] Id.

[9] Id. at 16.  Ms. O'Donnell also maintains other "miscellaneous files of just different documents" her office "receive[s] or create[s]" and that she described as "kind of a conglomeration of things."  O'Donnell Depo. at 18.

guidance the memorandum offered as to vice presidential records, id., beyond the general guidance that "[e]verything had to be kept and filed to be sent to the archives."  Id.  The second memorandum was issued by White House Counsel Harriet Miers shortly after she replaced Alberto Gonzales.  Id. at 44-45.  Ms. O'Donnell described this second memorandum as "basically the same thing" as the first, but could not "remember the details of it."  O'Donnell Depo. at 9.

Of note, Ms. O'Donnell did not receive and has no familiarity with the memorandum issued by Fred Fielding on October 8, 2008.  O'Donnell Depo. at 13.  This Court, based on its in camera review, described the Fielding memorandum as "contain[ing] references to Vice Presidential Records and includ[ing] at least one definition of what constitutes a Vice Presidential Record."  Minute Order of November 12, 2008.  Yet the Fielding memorandum -- prepared *after* plaintiffs filed this lawsuit --  was not shared with Ms. O'Donnell, the very person the White House has proffered as a knowledgeable declarant about the vice president's and OVP's compliance with the PRA.  This omission alone speaks volumes about the lack of competence of this witness to testify to the matters contained in her three declarations.

Beyond this limited and very generic written guidance, Ms. O'Donnell testified that she also has received verbal reminders and annual ethics briefings, each of which she described as imparting generic advice.  O'Donnell Depo. at 8, 10.  Ms. O'Donnell in turn has offered her staff only reminders about the process of how to archive records, and refers her staff to counsel if "they have more specific questions than that."  Id. at 10-11.[10]

As for the PRA itself, Ms. O'Donnell testified that while she has "read portions of it" she

---

[10] See also id. at 43 ("I always defer to counsel.").

"can't guarantee that I've read the whole thing."  Id. at 14.  Indeed, Ms. O'Donnell has no

working knowledge of what constitute "personal records" under the PRA.  O'Donnell Depo. at

22 ("I'm not sure of the definition of personal.").  And when asked about what is included in the

legislative records category, Ms. O'Donnell responded "I really don't distinguish myself . . ."

Id. at 23.

 Ms. O'Donnell has absolutely no personal knowledge about the vast majority of records

that either the OVP or the vice president himself creates or maintains.  She admitted that she is

"not familiar with how the Vice President's immediate office handles his papers or how he [the

vice president] does . . ."  Id. at 30.[11]  Similarly, she has no "firsthand knowledge of anything that

he [the vice president] has created that is not covered for us under the PRA."  O'Donnell Depo.

at 38.  When asked about a series of records on topics ranging from documents potentially

responsive to congressional subpoenas to records of communications between the OVP and the

FISA Court, Ms. O'Donnell admitted having no personal knowledge about how the records are

being treated under the PRA[12] and could only assume, based on the very general guidance she

has received, that the records are being preserved.  See id. at pp. 47-58.

 Most significantly, Ms. O'Donnell could shed little light on the factual and legal

foundation for her facially narrow definition of the vice president's functions as encompassing

only those "specially assigned to the Vice President by the President in the discharge of

executive duties and responsibilities."  This language -- like all of the language in her

---

 [11] See also id. at 30 (in response to questions about what the vice president does with
records that he keeps in his immediate office and how they are handled for purposes of the PRA
Ms. O'Donnell testified "I have no personal knowledge.").

 [12] Id. at 20 ("I don't have specific knowledge"; "I don't have personal knowledge."); 53.

declarations -- was drafted by counsel.[13]  When pressed on how this "specially assigned" language encompasses the various responsibilities that statutes assign to the vice president Ms. O'Donnell stated "I don't get into the legalese of all of the Vice President's duties."  Id. at 29, 34 ("I wouldn't want to get into the legalese of it.  I just know he does perform executive duties assigned to him by the President.").  Yet the precise question this Court is attempting to ascertain is the legal significance of this narrow definition of the vice president's duties and responsibilities.

Nor does it fall to Ms. O'Donnell to decide whether a particular activity constitutes vice presidential support of presidential functions.  See O'Donnell Depo. at 27 ("I wouldn't make that determination").  Moreover, Ms. O'Donnell admitted that "[t]he Vice President's staff isn't specially assigned.  The Vice President's staff is there to support the Vice President.  Whether he gets specially assigned is something between the President and the Vice President."[14]  And Ms. O'Donnell testified further, in explaining language drafted by counsel for her use in another lawsuit concerning the purposes for which the vice president and his staff conduct meetings with outside individuals, the vice president "is a man of authority, he is going to get a lot of information.  So it wouldn't be just to advise the President."  Id. at 63.

As this testimony reveals, Ms. O'Donnell was presented with declarations drafted by counsel that she readily signed, with no particular understanding of their legal implications or the reason why specific language, such as the "specially assigned" description, was used.  She was

---

[13] O'Donnell Depo. at  24, 32.

[14] Id. at 59.  Ms. O'Donnell also testified that she has not spoken directly to the vice president about records issues.  Id. at 29.

unaware of any other guidance or documentation containing this language.[15]  She could not explain why she used both the term "specially" and "executive"[16] to describe the vice president's functions and testified that she included this language upon "the advice of counsel."  Id. at 34. Nor could she confirm that all documents reflecting the vice president's "specially assigned" functions and duties are being treated as covered by the PRA; the most she could offer was her assumption, based on the orientation and general guidance she received as an OVP employee, that other OVP employees and the vice president himself were treating records as within the scope of the PRA.  See, e.g., id. at 35 ("People are aware of the guidance and the practices they should be adhering to.").

In sum, the deposition of Ms. O'Donnell has not provided answers to the Court's questions or advanced this litigation in any significant way.  Ms. O'Donnell simply has a very limited amount of personal knowledge and is unable to answer questions such as whether 'Vice President Cheney *only* engages in activities that fall within the two narrow categories that Defendants assert comprise all of his 'constitutional, statutory, or other official or ceremonial duties,'" and "whether various examples of Vice Presidential activities that were proffered by Plaintiffs . . . were considered by Defendants to fall within these narrow definitions."  Discovery Order, p. 12 (citations omitted) (emphasis added).  Accordingly, additional discovery is warranted.

## II.  THE RECORD NOW BEFORE THE COURT JUSTIFIES THE ADDITIONAL DEPOSITION OF DAVID ADDINGTON.

---

[15] O'Donnell Depo. at 32.

[16] O'Donnell Depo. at 34.

The D.C. Circuit directed this Court to substitute an appropriate witness for David Addington based on the Court's conclusion that Mr. Addington "has no apparent involvement in this litigation" and plaintiffs "have *so far* shown no need for the deposition of such a high-ranking member of the Office, especially when O'Donnell would seem more logically suited to clearing up lingering questions regarding her own affidavits."  Mandamus Op. at 5-6 (emphasis added).  The record now before the Court, however, compels a decidedly different conclusion. Not only has Ms. O'Donnell proven to be particularly ill-suited to clear up the Court's questions raised by her declarations, but her testimony and that of NARA official Nancy Kegan Smith point to David Addington as the most appropriate and knowledgeable deponent.

First, Nancy Kegan Smith testified[17] that NARA met with David Addington at the beginning of the administration as part of "NARA's traditional discussion . . . to discuss responsibilities under the Presidential and Vice Presidential Records Act . . ."[18]  Ms. Smith has had further discussions with Mr. Addington  about what would happen to the vice president's materials after the end of the administration.  Id. at 112-113.

Ms. O'Donnell also confirmed Mr. Addington's central role in the treatment of vice presidential records under the PRA.  First, Ms. O'Donnell reports directly to Mr. Addington and has daily contact with Mr. Addington, who is the "ultimate person held responsible for" the office.  O'Donnell Dep. at 8, 42.  Second, Mr. Addington has been one of the key sources for oral guidance Ms. O'Donnell has received on managing vice presidential records under the PRA,

---

[17] For the Court's convenience a rough transcript of Ms. Smith's testimony is attached as Exhibit 2 ("Smith Depo.").

[18] Smith Depo. at 84.

both in his capacity as chief of staff, id. at 9-10, 46, and as counsel to the vice president. Id. at 11. Third, Mr. Addington is one of the sources for Ms. O'Donnell's understanding of the vice president's functions and his support of record keeping guidance. Id. at 25, 29. And finally, Mr. Addington's central policy-making role within the OVP has been widely reported, including his connection to specific documents that would unquestionably qualify as vice presidential records.[19] In short, all roads appear to lead to David Addington.

Mindful of the D.C. Circuit's admonition that "[t]he duties of high-ranking executive officers should not be interrupted by judicial demands for information that could be obtained elsewhere,"[20] plaintiffs requested that defendants identify an additional deponent competent to answer the Court's questions. See Letter from Anne Weismann to Helen Hong, November 14, 2008 (attached as Exhibit 3). Defendants refused to identify another individual in lieu of David Addington, disputing the need for any additional discovery. See Letter from Helen Hong to Anne Weismann, November 17, 2008 (attached as Exhibit 4). Of note, defendants' argument that further discovery is unwarranted relies not on the Court's Discovery Order explaining the Court's questions that form the basis for the authorized discovery, but on stray sentences culled from pleadings plaintiffs filed both in this Court and before the D.C. Circuit. The grounds plaintiffs asserted for denying the mandamus petition or in support of their initial request for discovery (id. at pp. 1-2) do not address the critical problem that the *Court's questions* have yet to be answered. Moreover, defendants' further suggestion that plaintiffs are not entitled to seek

---

[19] See, e.g., Barton Gellman, Angler The Cheney Vice Presidency, 2008; Jack Goldsmith, The Terror Presidency, 2007; Jane Mayer, The Dark Side, 2008.

[20] Mandamus Op. at 6.

discovery because they failed to move before the close of discovery on November 14, 2008, id. at 2, fails to take into account that Ms. O'Donnell's deposition was not concluded until November 13 and defendants did not respond to plaintiffs' request for the designation of an additional witness until nearly the close of business on November 17, 2008.

In sum, the deposition testimony to date confirms that Claire O'Donnell is not a competent witness to clear up the fundamental questions raised by her declarations, while David Addington is knowledgeable about the subject of this litigation and competent to address the Court's questions. Accordingly, because defendants have identified no other witness as a viable alternative and plaintiffs have now shown a specific need for Mr. Addington's deposition, the Court should authorize plaintiffs to depose Mr. Addington as soon as possible.[21]

### III. PLAINTIFFS SHOULD BE PERMITTED TO RE-DEPOSE NANCY KEGAN SMITH ON THE SUBJECT OF A WHITE HOUSE COUNSEL MEMORANDUM THAT THIS COURT HAS CONCLUDED IS WITHIN THE SCOPE OF DISCOVERY AND NOT SUBJECT TO ANY PRIVILEGE.

During her deposition Nancy Kegan Smith identified a memorandum prepared by White House Counsel Fred Fielding that she had received and that set forth guidance on implementing the PRA. In response to plaintiffs' questions about the contents of the memorandum, defendants objected both on privilege and scope grounds. The Court has now conducted an in camera review and concluded that this memorandum is both within the scope of the Court's Discovery Order and not privileged. Accordingly, the Court has authorized plaintiffs to question defendants' witnesses about its contents. Minute Order of November 12, 2008.

---

[21] Alternatively, the Court could proceed with a hearing at which Mr. Addington would testify to the areas identified in the Court's discovery order. Such a hearing would lead to no "'unwarranted impairment' of the functioning of OVP." Mandamus Op. at 6 (quoting Cheney v. U.S. Dist. Court, 542 U.S. 367, 390 (2004)).

As discussed above, Claire O'Donnell has neither received this memorandum nor been made aware of its contents. Thus, her deposition failed to obviate the need to re-depose Ms. Smith, as plaintiffs had hoped would be the case. Accordingly, plaintiffs seek leave to re-depose Ms. Smith about the memorandum, as authorized by the Court's minute order. As an alternative and preferable course, in light of the need to complete discovery as expeditiously as possible and to avoid the burden and expense of re-deposing Ms. Smith, plaintiffs request that the Court order defendants to produce the memorandum to plaintiffs. As a single, unprivileged document, defendants can have no valid objection to its production.

## CONCLUSION

For the foregoing reasons plaintiffs respectfully request that this motion be granted, that they be given leave to depose David Addington as quickly as possible, and that defendants be directed to either produce Nancy Kegan Smith for a re-deposition on the contents of the Fielding Memorandum or produce a copy of the memorandum to plaintiffs.

Pursuant to LCvR 7(m), counsel for plaintiffs contacted defendants' counsel by telephone on November 17, 2008, and again on November 18 to determine whether there is any opposition to the relief plaintiffs are seeking and to attempt to narrow the areas of disagreement. Defendants' counsel did not return either call but instead sent plaintiffs' counsel an email on November 18, stating that defendants oppose plaintiffs' motion to depose David Addington.

Respectfully submitted,

/s/ _____
Anne L. Weismann
(D.C. Bar No. 298190)
Melanie Sloan
(D.C. Bar No. 434584)
Citizens for Responsibility and Ethics

13

in Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C. 20005
Phone: (202) 408-5565
Fax: (202) 588-5020
David L. Sobel
(D.C. Bar No. 360418)
1875 Connecticut Avenue, N.W.
Suite 650
Washington, D.C. 20009
Phone: (202) 797-9009

Dated:  November 18, 2008                    Attorneys for Plaintiffs