**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON, *et al.*,

      Plaintiffs,

      v.

RICHARD B. CHENEY, Vice President of
the United States, *et al.*,

      Defendants.

Civil Action No. 08-1548 (CKK)

**MEMORANDUM OPINION**
(January 19, 2009)

> *"Were we both to die to-day, to-morrow two other names would be in the place of ours, without any change in the motion of the machinery.  Its motion is from its principle, and not from you or myself."*

>     - Thomas Jefferson to John Adams, reflecting on their disagreements about the federal government.[1]

This case concerns matters of significance extending beyond its individual parties, requiring a discussion of how the three branches of government interact to preserve documents that form part of our nation's history.  At risk, according to Plaintiffs, are Vice-Presidential records that may be lost or destroyed as the current Presidential Administration ends on January 20, 2009.  The Court previously entered a Preliminary Injunction on September 20, 2008, requiring Defendants to preserve these records during the pendency of the litigation.

    Resolution of this case has been impeded by Defendants' constantly shifting arguments and their emergency petition for mandamus to the Court of Appeals for the District of Columbia

---

[1] Letter from Thomas Jefferson to Dr. Benjamin Rush (Jan. 1811), *reprinted in* http://etext.virginia.edu/toc/modeng/public/JefCycl.html (follow "Letter 77" hyperlink) (describing Jefferson's conversation with Adams).

Circuit, all of which have delayed but not prevented the continuation of these proceedings. Nevertheless, the Court has now required Defendants to take a firm position on the remaining issues in this case by ordering a final round of consolidated briefing prior to the January 20, 2009 change of Administrations.  Pursuant to the schedule set by the Court, Defendants filed a consolidated Motion to Dismiss, or in the alternative, Motion for Summary Judgment on December 8, 2008, asserting various threshold legal defenses and arguing that, if any of the Plaintiffs' claims are legally cognizable, that entry of summary judgment in favor of Defendants is appropriate.  Plaintiffs filed a Cross-Motion for Summary Judgment and Opposition to Defendants' Motion on December 22, 2008, and the parties proceeded to brief both motions, which became ripe as of January 5, 2009.

Plaintiffs' claims implicate the Presidential Record Act ("PRA" or "the Act"), 44 U.S.C. § 2201 *et seq.*, which Congress enacted following a controversy surrounding President Richard M. Nixon's Presidential records.  The PRA incorporates an assumption made by Congress (in 1978) that subsequent Presidents and Vice Presidents would comply with the Act in good faith, and therefore, Congress limited the scope of judicial review and provided little oversight authority for the President and Vice President's document preservation decisions.  As a consequence, even though Plaintiffs in this case have identified (through discovery) that the National Archives and Records Administration may have provided the Vice President with document preservation guidance that conflicts with the requirements in the PRA, Plaintiffs cannot obtain relief under the Act *as Congress enacted it*.  To the extent that this case highlights any deficiencies in – or unintended consequences of – the PRA, that is an issue for Congress to consider.  This Court is bound to apply the law only as it is written, not how the Court or any party believes it ought to be.

2

Accordingly, after a searching review of the parties' submissions and attachments thereto, applicable case law, statutory authority, and entire record of the case as a whole, the Court finds that Plaintiffs have brought legally cognizable declaratory judgment and mandamus claims against the Vice President and the Office of the Vice President, but that the Court is compelled to enter summary judgment in Defendants' favor. The Court shall GRANT-IN-PART and DENY-IN-PART Defendants' Motion to Dismiss, GRANT Defendants' Motion for Summary Judgment, and DENY Plaintiffs' Cross-Motion for Summary Judgment, for the reasons that follow.

## EXECUTIVE SUMMARY[2]

- Plaintiffs filed this suit for declaratory and mandamus relief to prevent the alleged destruction of Vice-Presidential records in violation of the Presidential Records Act. Because Congress enacted that statute in 1978 with the assumption that future Presidents and Vice Presidents would comply with it in good faith, Congress drastically limited the scope of outside inquiries related to the Vice President's handling of his own records during his term in office.

- Despite these limitations, Plaintiffs have asserted legally cognizable claims for declaratory and mandamus relief against the Vice President and the Office of the Vice President. The record preservation guidelines implemented by the Vice President and the Office of the Vice President are subject to judicial review, and Plaintiffs have standing to assert these claims.

- Plaintiffs have not asserted legally cognizable claims against the Executive Office of the President, the Archivist of the United States, and the National Archives & Records Administration ("NARA"). Plaintiffs failed to demonstrate that these Defendants have any statutory authority over the document preservation guidelines implemented by the Vice President and the Office of the Vice President during the Vice President's term in office.

- The Court granted discovery in this case to allow clarification regarding whether the Defendants are, in fact, complying with the Presidential Records Act. Plaintiffs deposed the Deputy Chief of Staff to the Vice President, who testified that the Vice President and the Office of the Vice President are fully complying with their obligations under the

---

[2] This Executive Summary is provided due to the length of the Court's Memorandum Opinion, but is not itself a part of the Opinion as it only reflects some of the Court's ultimate findings and conclusions.

Presidential Records Act.  Plaintiffs were unable to rebut this representation through their discovery.  The Court therefore has no basis on which to award Plaintiffs relief against the Vice President and the Office of the Vice President.

- Plaintiffs were able to confirm during discovery that the Archivist and NARA have not made a final determination as to whether or not the Vice President's legislative records might be "personal" records that need not be preserved under the PRA.  Although the PRA clearly contemplates that the Vice-President's legislative records are not personal records, the Court cannot grant Plaintiffs any relief because neither the Archivist nor NARA have the statutory authority to affect the preservation decisions of the Vice President or the Office of the Vice President during the Vice President's term in office under the Presidential Records Act.  The Vice President and the Office of the Vice President nevertheless concede that such documents must be preserved under the Presidential Records Act.

- Plaintiffs argue throughout their submissions to the Court that the Presidential Records Act should not be read to vest broad discretion in the Vice President to handle the preservation of his own records during his term in office without the possibility of judicial oversight.  The Court is nevertheless bound to apply the Presidential Records Act as Congress enacted it, which provides only narrow areas of oversight relating to the Vice President's document preservation decisions.

- To the extent that this lawsuit highlights any unintended consequences stemming from the Presidential Records Act, Plaintiffs' remedy lies with Congress and not this Court.

## I.  BACKGROUND

Plaintiffs, Citizens for Responsibility and Ethics in Washington ("CREW") and a number

of individual historians, archivists, and organizations of archivists and historians, bring the

above-captioned action seeking declaratory and mandamus relief against Defendants, Vice

President Richard B. Cheney in his official capacity, the Executive Office of the President

("EOP"), the Office of the Vice President ("OVP"), the National Archives and Records

Administration ("NARA"), and Dr. Allen Weinstein, Archivist of the United States, in his

official capacity.[3]  Plaintiffs allege that Vice President Cheney, the OVP, and the EOP have

_____

[3] In addition to CREW, the other Plaintiffs are Stanley I. Kutler, Martin J. Sherwin, the American Historical Association, the Organization of American Historians, the Society of American Archivists, and the Society for Historians of American Foreign Relations.

improperly excluded records from the PRA, and seek a declaratory judgment or a writ of

mandamus based on those allegations.  Plaintiffs also allege that NARA and the Archivist have

improperly excluded records from the PRA and failed to comply with the Administrative

Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, and seek a declaratory judgment or a writ of

mandamus based on those allegations.

A.      *The Presidential Records Act*

The PRA defines the term "Presidential records" as:

> documentary materials, or any reasonably segregable portion thereof, created or
> received by the President, his immediate staff, or a unit or individual of the
> Executive Office of the President whose function is to advise and assist the
> President, in the course of conducting activities which relate to or have an effect
> upon the carrying out of the constitutional, statutory, or other official or
> ceremonial duties of the President.

44 U.S.C. § 2201(2).   Pursuant to the PRA, "[t]he United States shall reserve and retain

complete ownership, possession, and control of Presidential records," *id.* § 2202, and the

President is directed to "take all such steps as may be necessary to assure that the activities,

deliberations, decisions, and policies that reflect the performance of his constitutional, statutory,

or other official or ceremonial duties are adequately documented and that such records are

maintained as Presidential records . . . .," *id.* § 2203.  The PRA differentiates "Presidential

records" from "personal records," defining "personal records" as "all documentary materials, or

any reasonably segregable portion thereof, of a purely private or nonpublic character which do

not relate to or have an effect upon the carrying out of the constitutional, statutory, or other

official or ceremonial duties of the President."  *Id.* § 2201(3).

The PRA specifically directs that Vice-Presidential records are subject to the provisions

of the PRA "in the same manner as Presidential records," and provides that "[t]he duties and

responsibilities of the Vice President, with respect to Vice-Presidential records, shall be the same

as the duties and responsibilities of the President under [the PRA] with respect to Presidential

records." *Id.* § 2207.  Based on the subject matter of the present suit, it bears emphasizing that

the Vice President is *required* to take steps to assure that Vice-Presidential records, as they are

defined in the PRA, are appropriately maintained and preserved.  *Id.* § 2203(a) ("the [Vice]

President shall take all such steps as may be necessary to assure . . . that such records are

maintained as [Vice-] Presidential records").

The PRA allows the President and Vice President to dispose of Presidential and Vice-

Presidential records during their terms in office "that no longer have administrative, historical,

information, or evidentiary value," but only after complying with particular requirements for

notifying both the Archivist and the appropriate congressional committee of the planned disposal.

*Id.* § 2203(c)-(d).  The PRA provides that upon conclusion of the President and Vice President's

last term in office, "the Archivist of the United States shall assume responsibility for the custody,

control, and preservation of, and access to," Presidential and Vice-Presidential Records.  *Id.* §

2203(f)(1).  The PRA further imposes a duty on the Archivist to "make such records available to

the public as rapidly and completely as possible consistent with the provisions of the [PRA]."  *Id.*

B.     *Plaintiffs' Allegations*[4]

The Amended Complaint details a series of statements and/or acts leading Plaintiffs to

believe that Defendants are improperly excluding one or more categories of Vice-Presidential

records from the PRA.  These allegations proceed along two tracks.  First, Plaintiffs focus on an

---

[4] For purposes of Defendants' Motion to Dismiss, the Court "'must accept as true all of the factual allegations contained in the complaint.'"  *Muir v. Navy Fed. Credit Union*, 529 F.3d 1100, 1108 (D.C. Cir. 2008) (quoting *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007)).

Executive Order issued by President George W. Bush on November 1, 2001, titled "Further

Implementation of the Presidential Records Act."  Am. Compl. ¶ 27.  Section 11(a) of the

Executive Order provides that "the Presidential Records Act applies to the executive records of

the Vice President."  *Id.*  Plaintiffs allege that this provision narrows the scope of records

retained by the Vice President based on its use of the phrase "executive records," rather than the

definition provided in the PRA ("documentary materials . . . which relate to . . . the carrying out

of the constitutional, statutory, or other official or ceremonial duties of the Vice President").  *Id.*

¶ 28.  The Archivist has also announced his intention to abide by this Executive Order.  *Id.* ¶ 29.

Second, Plaintiffs describe instances when the EOP, the OVP, and Vice President Cheney

have indicated that "they are not part of the executive branch."  *Id.* ¶ 30.  Since 2003, the Vice

President and OVP have not filed reports with NARA concerning data they have classified or

declassified in accordance with Executive Order 12,958, as amended by Executive Order 12,292.

*Id.*  In 2004, the OVP "refused to permit NARA to conduct an on-site inspection of the

procedures and facilities used by the OVP to safeguard classified national security information."

*Id.*  To justify its actions, the Vice President explained that the OVP was not an entity within the

executive branch.  *Id.*

In 2004, the OVP refused to provide information for inclusion in the United States

Government Policy and Support Positions, also known as the "Plum Book."  *Id.* ¶ 32.  The 2008

edition of the Plum Book describes the OVP as "a unique office that is neither a part of the

executive branch nor a part of the legislative branch, but is attached by the Constitution to the

latter."  *Id.* ¶ 32.  David Addington, the Vice President's chief of staff, testified before the House

Judiciary Committee that the Vice Presidency "belongs to neither" the executive or legislative

branch, but is "attached by the Constitution" to Congress.  *Id.* ¶ 33.  The White House also

7

released a recent report on its staff to Congress that did not include any staff members from the

OVP.  *Id.* ¶ 34.

On at least three occasions, the Vice President and the OVP "refused to comply with the

Ethics Reform Act of 1989, which requires every executive agency to file a semi-annual report of

payments accepted from non-federal sources."  *Id.* ¶ 31.  Vice President Cheney drafted a letter to

the Office of Government Ethics dated June 2, 2008, reaffirming that "the disclosure

requirements for privately paid travel do not apply to the OVP, which the OVP claims is not an

agency in the executive branch."  *Id.*

Based on these statements and/or acts described above, Plaintiffs allege that "the [V]ice

[P]resident and the OVP have adopted policies and guidelines that exclude from the reach of the

PRA all but a narrow category of [Vice-Presidential] records created or received in the very

limited circumstances in which the [V]ice [P]resident deems himself to be acting as part of the

executive branch."  *Id.* ¶ 35.  Plaintiffs also allege that "NARA has adopted policies and

guidelines, without the benefit of public notice and comment, that exclude from the reach of the

PRA records generated or received by [V]ice [P]residents in their congressional capacities, *i.e.*,

when they preside over the Senate."  *Id.* ¶ 37.  The result, according to Plaintiffs, is that NARA

considers the congressional records of Vice President Cheney "to be his personal records that he

is free to dispose of at will."  *Id.* ¶ 38.  Plaintiffs assert that the consequence of these policies and

guidelines is that a significant number of records that should be preserved under the PRA will be

destroyed at the conclusion of this Presidential Administration:

> because of the policies and guidelines that the [V]ice [P]resident, the OVP and
> NARA have developed, Vice President Cheney will take with him as his personal
> papers or otherwise dispose of a significant percentage of those records, including
> records that pertain to the carrying out of his legislative duties and functions.  As a
> necessary consequence, NARA and the archivist will not assume control over all

[Vice-Presidential records] as defined under the PRA.

*Id.* ¶ 41.  *See also id.* ¶ 44 (documents may be destroyed, transferred, or disposed of during the transition between Presidential Administrations).

On July 21, 2008, CREW sent a letter to Gary Stern, General Counsel of NARA, describing CREW's concerns about possible PRA violations and "confirming a telephone conversation of that date in which Mr. Stern described NARA's policy of treating the legislative records of the [V]ice [P]resident subject to the PRA as their personal records." *Id.* ¶ 46.  CREW did not receive a response to its letter.  *Id.*  This lawsuit followed shortly thereafter.

Plaintiffs' Amended Complaint contains four claims for relief.  Count I seeks relief against the Vice President, the OVP, and the EOP under the Declaratory Judgment Act, 28 U.S.C. § 2201.  Plaintiffs seek a declaration that

> guidelines of the [V]ice [P]resident, the OVP, and the EOP implementing the PRA in a manner that excludes from its reach the records that the [V]ice [P]resident and his office create and receive in the course of conducting activities relating to or having an effect on the carrying out of the [V]ice [P]resident's constitutional, statutory or other official or ceremonial duties and their implementation of those guidelines are contrary to the law.

*Id.* ¶ 52.

Count II seeks relief against the Vice President and the OVP, pursuant to the Mandamus Act, 28 U.S.C. § 1361.  Plaintiffs seek a writ of mandamus to require "Vice President Cheney and the OVP to comply with their statutory duty to treat as subject to the PRA all records of the [V]ice [P]resident and his office that relate to the exercise of his constitutional, statutory and other official or ceremonial duties." *Id.* ¶ 58.

Count III seeks relief against the Archivist and NARA for implementing PRA guidelines that improperly exclude the legislative records of the Vice President.  *Id.* ¶ 62.  Plaintiffs further

allege that the implementation of these guidelines violates the Administrative Procedure Act

("APA"), 5 U.S.C. §§ 702, *et seq.*  Accordingly, Plaintiffs seek a declaratory judgment that

> the [V]ice [P]resident's and [the] OVP's guidelines implementing the PRA in a
> manner that excludes from its reach all of the records that the [V]ice [P]resident
> and his office create and receive in the course of conducting activities relating to
> or having an effect on the carrying out of the [V]ice [P]resident's constitutional,
> statutory, or other official or ceremonial duties are contrary to the law.

*Id.* ¶ 64.  To the extent the Archivist and NARA have not yet implemented their guidelines,

Plaintiffs seek a declaration that "the guidelines, which are contrary to the terms of the PRA, are

unlawful and the defendants may not implement those guidelines."  *Id.* ¶ 65.

Finally, Count IV seeks mandamus relief against the Archivist and NARA to require their

compliance "with their statutory duty to treat as subject to the PRA [the] records of the [V]ice

[P]resident and his office that relate to the carrying out of his legislative functions and duties."

*Id.* ¶ 71.

C.     *Procedural History*

To say that this case has had a brief but tortured history would be an understatement.

From its inception, Defendants were unable (or unwilling) to maintain consistent factual

positions, and their course of conduct seemed to reflect their belief that they needed to explain

their positions only on a "need to know" basis.  Although the Court has identified these

difficulties in previous orders and opinions, the Court shall again describe them below because

they are necessary to explain the current posture of this case.

Plaintiffs filed their initial Complaint on September 8, 2008, along with a Motion for

Preliminary Injunction.[5]  On September 10, 2008, the Court held a conference call on the record

---

[5] Plaintiffs filed an Amended Complaint on September 15, 2008.

with counsel for all parties participating, to discuss the possibility of addressing Plaintiffs'

Motion for Preliminary Injunction through a decision on the merits of Plaintiffs' Complaint, with

the benefit that all parties would be afforded the opportunity to provide more fulsome briefing on

the merits than would be possible under the truncated preliminary injunction schedule set forth in

Local Civil Rule 65.1.  Defendants indicated during the call that they were "willing to preserve

all records that are related to this suit or that are at issue in this suit," and identified a "subset" of

legislative records that they believed were at issue.  The parties were subsequently unable to

agree on a stipulation or consent order to preserve these records, however, and the Court re-

imposed the preliminary injunction briefing schedule.

Defendants filed an Opposition to the Motion for Preliminary Injunction on September

16, 2008, which opposed the Motion on factual–*not* legal–grounds:

> The Vice President and the Office of Vice President ("OVP") have been carrying
> out since January 20, 2001–and intend to continue to carry out–their obligations
> under the Presidential Records Act with respect to documentary materials that
> relate to or have an effect upon the Vice President's constitutional, statutory or
> other official and ceremonial duties, both executive-related and legislative-related
> duties.

Defs.' Opp'n to Pls.' Mot. for a PI at 1.  Defendants supported their Opposition with

Declarations filed by Claire M. O'Donnell, Assistant to the Vice President and Deputy Chief of

Staff, and Nancy Kegan Smith, Director of the Presidential Materials Staff in the Office of

Presidential Libraries at NARA.  *See id.*, Exs. 1 (hereinafter "O'Donnell Decl.") and 2

(hereinafter "Smith Decl.").

Ms. O'Donnell's Declaration gave rise to a key factual dispute in this case.  She first

defined the term "Vice-Presidential records" by referencing the definition of the term set forth in

the PRA (*i.e.*, Vice-Presidential records consist of documentary materials related to "the

constitutional, statutory, or other official or ceremonial duties of the Vice President"). *See*

O'Donnell Decl. ¶ 5. Ms. O'Donnell then inexplicably included two "sub-definitions" that

narrowed the PRA's language, stating that "[t]he constitutional, statutory, or other official or

ceremonial duties of the Vice President include both the functions of the Vice President as

President of the Senate and the functions of the Vice President specially assigned to the Vice

President by the President in the discharge of executive duties and responsibilities." *Id.* The

introduction of these two sub-definitions made it unclear whether Defendants were narrowing the

broad language of the PRA in a way that excluded documentary materials that legally should be

covered by the PRA. The Court sought to clarify the ambiguity by inquiring of Defendants:

> Does this statement indicate that Defendants interpret the phrase "the
> constitutional, statutory, or other official or ceremonial duties of the Vice
> President" as exclusively encompassing "the functions of the Vice President as
> President of the Senate" and "the functions of the Vice President specially
> assigned to the Vice President by the President in the discharge of executive
> duties and responsibilities?"

Order at 1 (Sept. 17, 2008), Docket No. [12].

Defendants responded that "the short answer to the Court's question is yes." *See* Defs.'

Resp. at 1. Defendants' Response was supported by a second Declaration by Ms. O'Donnell, in

which she avers that

> all the constitutional, statutory, or other official or ceremonial duties of the Vice
> President fall within either (a) the category of functions of the Vice President
> specially assigned to the Vice President by the President in the discharge of
> executive duties and responsibilities or (b) the category of the functions of the
> Vice President as President of the Senate.

*Id.*, Ex. 1 ¶ 5 (Suppl. O'Donnell Decl.). She further averred that "[a] Vice President has no

functions unless they are specially assigned to the Vice President by the President in the

discharge of executive duties and responsibilities." *Id.* ¶ 6.

The Court issued an Order for a Preliminary Injunction on September 20, 2008. *See* Order at 1-2 (Sept. 20, 2008), Docket No. [15]. The Court explained that "Defendants' Response to the Court's latest question makes unmistakably clear that Defendants apply a narrowing interpretation to [the language of the PRA]." Mem. Op. at 11 (Sept. 20, 2008), Docket No. [16]. This conclusion was apparent because

> Defendants [] define the terms used in the PRA–the 'constitutional, statutory, or other official or ceremonial duties of the [Vice] President'–to include *only* those 'functions of the Vice President specially assigned to the Vice President by the President in the discharge of executive duties and responsibilities' and 'functions of the Vice President as President of the Senate.'

*Id.* at 11 (citing Suppl. O'Donnell Decl. ¶ 5; Defs.' Resp. at 1). The Court further explained that Ms. O'Donnell's declarations stated the apparent legal conclusion that the PRA's definition of documentary materials was properly limited to the documentary materials falling under one of these two sub-definitions, but that the Declarations and Defendants' pleadings were "bereft of any legal analysis demonstrating that Defendants' interpretation [was] correct as a matter of law or any identification of legal authority that would allow Defendants to place limitations on the PRA's statutory language." *Id.* at 12. The Court also explained that Ms. O'Donnell's declarations and Defendants' pleadings gave rise to numerous factual questions, such as whether "Vice President Cheney *only* engages in activities that fall within the two narrow categories that Defendants assert comprise all of his 'constitutional, statutory, or other official or ceremonial duties,'" *id.* at 12 (emphasis in original), and whether various examples of Vice Presidential activities that were proffered by Plaintiffs–including those based on the Vice President's statutory duties imposed by Congress–were considered by Defendants to fall within these narrow definitions. *Id.* at 14.

Defendants filed a Motion for Reconsideration of the Preliminary Injunction Order on September 23, 2008, and attached a third Declaration by Ms. O'Donnell.  The Motion for Reconsideration reasserted Defendants' conclusion that the Vice President, "in performing his duties engages in the two categories of functions identified in the declarations and only in those categories," and that the OVP has applied the PRA "to the [Vice-Presidential] records created or received in the course of engaging in those two functions."  Defs.' Mot. for Recons. at 3 (citing Second Suppl. Decl. of Ms. O'Donnell) (emphasis in original omitted).

Defendants' Motion for Reconsideration notably failed to provide any legal analysis supporting their position that the two sub-definitions were legally appropriate interpretations of the PRA's broad language, despite the Court's previous focus on the lack of such authority in its Memorandum Opinion accompanying the Preliminary Injunction Order.  *See* Mem. Op. at 12 (Sept. 20, 2008), Docket No. [16].  Defendants also failed to explain why their sub-definitions were necessary or appropriate if Defendants believed that they were co-extensive with the broad language of the PRA.  Although Defendants' Motion for Reconsideration explained that Defendants were using the phrase "specially assigned by the President" based on language found in 3 U.S.C. § 106, *see* Defs.' Mot. for Recons. at 5, the Court reviewed that statute and found that it was a budgetary provision related to the Vice President's hiring and payment of staff, and not a statute related to the classification of materials under the PRA.  The seminal legal question in the case therefore remained:  whether Defendants' interpretation of the PRA's language was supported as a matter of law.  The factual disputes related to that question also remained, among them whether Defendants were correctly classifying documentary materials by applying their narrowing definitions of the PRA's language.

14

On the same day that Defendants filed their Motion for Reconsideration, the Court held a conference call on the record with all parties participating. During the call, Defendants decided to introduce a new twist to their arguments. Rather than argue that Ms. O'Donnell's sub-definitions were legally justifiable (based on a budgetary provision or otherwise), Defendants argued for the first time that the sub-definitions were actually created for purposes of this litigation only, and that Defendants were not using these sub-definitions to classify documents under the PRA.[6] Defendants' new position raised yet another set of questions. First, as noted above, the Court's Memorandum Opinion accompanying its Preliminary Injunction Order described the Court's observation that Defendants had not offered any legal analysis supporting these sub-definitions. *See* Mem. Op. at 12 (Sept. 20, 2008), Docket No. [16]. Instead of filing a Motion for Reconsideration indicating that the definitions were created only for purposes of this litigation and that Defendants *were* complying with the broad definition in the PRA, Defendants' Motion for Reconsideration *reaffirmed* Defendants' reliance on, and application of, these two narrow definitions. *See* Defs.' Mot. for Recons. at 3 ("the Office of the Vice President has applied section 2207 to the vice presidential records created or received in the course of engaging in those [two categories of] functions"). Second, Defendants' new position that they created the sub-definitions for purposes of this litigation appeared incongruous with Defendants' previous representations that the definitions were derived from language in a budgetary provision. *See* Defs.' Mot. for Recons. at 5 (citing 3 U.S.C. § 106).

---

[6] Despite this argument, Defendants' counsel would not concede that these definitions did not exist prior to this litigation. *See* 9/23/08 Conf. Call Tr. 19:15 - 19:17 ("THE COURT: So, [the definitions] didn't exist [before the litigation]? DEFENDANTS' COUNSEL: Well I can't say that they didn't exist beforehand").

During the September 23, 2008 conference call, and after the Court described these issues relating to Defendants' new argument, Defendants sought to shift course yet again and, instead of relying on the factual arguments they had previously advanced, proposed that the Court permit another round of briefing to advance jurisdictional arguments in the context of a Motion to Dismiss.  The Court rejected the proposal because Defendants failed to explain what jurisdictional arguments they would pursue and how those grounds were unrelated to the factual disputes in the record that prevented the case from moving forward.  This lack of specificity was also reflected in Defendants' submissions to the Court, none of which had raised (at that time) any jurisdictional arguments.[7]  The Court expressly advised Defendants that they could raise jurisdictional arguments in the parties' final round of briefing pursuant to a schedule set by the Court, and that the Court would consider jurisdictional arguments prior to reaching any merits arguments advanced by the parties.

Having considered Defendants' multiple positions taken in the litigation, the Court found that the parties' briefing had reached an impasse.  The Court could not resolve the legal questions in this case without further factual information that was within the knowledge of specific government officials, but previous attempts to obtain that information had served to confuse, rather than clarify, the factual questions that remained.  The posture of this case was particularly problematic because any decision issued after January 20, 2009–the date of the Vice-Presidential

---

[7] Defendants' Motion for Reconsideration did contain a brief argument concerning standing.  *See* Defs.' Mot. for Recons. at 8-9.  A review of that argument, however, revealed that it was predicated on Defendants' *ipse dixit* that Plaintiffs lack injury because Defendants are complying with the PRA.  This argument required a circular inquiry into whether, in fact, Defendants are complying with the PRA given their interpretation of it – the seminal question that required factual clarification.

transition–risked the misplacement of documents potentially at issue in this litigation.[8]

For all of these reasons, the Court asked the parties to submit a Status Report proposing an appropriate briefing schedule and addressing whether narrow and expedited discovery by one or more parties would have to be incorporated into that schedule. *See* Min. Order dated Sept. 22, 2008. Pursuant to the parties' Status Report, only Plaintiffs requested permission to take discovery. *See* Status Report at 1-10 (Sept. 23, 2008). The Court granted Plaintiffs' request to depose two individuals–David Addington, the Vice President's Chief of Staff, and Nancy Kegan Smith, the Director of the Presidential Materials Staff in the Office of Presidential Libraries at NARA–and incorporated a brief window for discovery prior to requiring the parties to file a final round of briefing. *See* Discovery Order at 18 (Sept. 24, 2008), Docket No. [20]. The Court determined that these two depositions were necessary to resolve the factual and legal questions in the record that previous briefing had failed to clarify and without which the case could not move forward.

The Court also determined that these depositions were a more appropriate method for expedited discovery than written discovery because Defendants had already submitted four declarations that failed to resolve the factual and legal disputes in the record. The depositions were likely to be completed more quickly than written discovery and would allow for follow up questioning to clarify any statements. The Court also found that the discovery was necessary to resolve both Defendants' Motion for Reconsideration of the Court's Preliminary Injunction

---

[8] In fact, during the first conference call with the parties on September 10, 2008, the Court explained that, given the Court's November and December trial schedule, and given that the Complaint appeared to potentially involve complex issues of first impression, the parties would have to complete their briefing no later than November 17, 2008, to provide the Court with sufficient time to reach its decision prior to January 20, 2009.

Order, as well as the parties' competing merits arguments concerning Defendants' interpretation

of the PRA.[9]

In response to Defendants' request for guidance as to the scope of discovery, the Court

issued a Discovery Order that limited Plaintiffs' questions to six areas of inquiry:

> 1. The interpretation and application of the PRA by any Defendant, and any policies or record keeping practices related thereto or derived therefrom.

> 2. The existence, and any Defendant's custody or control of, individual records or categories of records that are or are not covered by the PRA, including but not limited to documentary material in the possession, custody or control of the Vice President, including records in his Senate office.

> 3. The functions of the Vice President that have generated, or that could generate, documentary materials covered or not covered by the PRA, including but not limited to any functions that are not "specially assigned" by the President.

> 4. The documentary materials that NARA has received or has not received from Defendants.

> 5. The interactions between any Defendant and NARA, which includes communications to or from employees working within the office of any named non-individual Defendant, concerning documentary materials covered or not covered by the PRA.

> 6. The basis for the knowledge of any deponent or Claire M. O'Donnell.

Discovery Order at 18-19 (Sept. 24, 2008), Docket No. [20].

On September 30, 2008, Defendants filed a Motion to Stay pending an Emergency

Petition for a Writ of Mandamus to the Court of Appeals for the District of Columbia Circuit.

Defendants' motion argued that this Court had either ignored or denied one or more of

Defendants' jurisdictional arguments in favor of allowing Plaintiffs to take intrusive discovery

---

[9] The Court instructed the parties to combine any briefing related to Defendants' Motion for Reconsideration into the final round of briefing ordered by the Court.

concerning a wide-range of factual issues that were inappropriate for judicial review. *See* Mem.

Op. at 2 (Oct. 5, 2008), Docket No. [27]. Because that argument bore no resemblance to what

had actually transpired in this case, and because the Defendants' other arguments were similarly

vacuous, the Court denied Defendants' request for a stay pending their Emergency Petition for

Mandamus. *Id.* at 1-26.

On October 31, 2008, the D.C. Circuit responded to Defendants' Petition and explained

that this Court's decision to allow expedited and narrow discovery prior to resolution of the

issues raised by the parties was entirely appropriate:

> In the judgment of the district court here, the current litigation posture necessitates
> limited discovery to permit timely adjudication of the factual defense [the] OVP
> has itself raised. On the basis of the procedural record in the district court and
> given the deference we owe trial courts in the management of their cases, that
> judgment is not remotely one from which defendants have an indisputable right to
> relief.

*In re Cheney*, 2008 U.S. App. LEXIS 25841 at * 6 (Oct. 31, 2008) (internal citation omitted).

The D.C. Circuit therefore denied Defendants' Petition for Mandamus, save in one respect. The

D.C. Circuit suggested the substitution of Claire O'Donnell in place of David Addington because

Ms. O'Donnell seemed capable of answering questions concerning the declarations that she

herself submitted and because Mr. Addington was the Vice President's Chief of Staff. *Id.* at *7-

*9. This Court complied with the D.C. Circuit's ruling on the same day by ordering the

substitution of Ms. Donnell for Mr. Addington.

Plaintiffs deposed Nancy Kegan Smith on November 10, 2008. During the course of her

deposition, Ms. Smith raised the existence of three memoranda that had been drafted by White

House counsel that related to PRA instructions or guidance. Defendants' counsel objected to

Plaintiffs' follow up questions about these memoranda and instructed Ms. Smith not to answer

based on privilege (deliberative process or attorney-client) and the scope of discovery. Following the deposition, the parties contacted Chambers to discuss whether Defendants' objections were proper, anticipating that the same issue would arise during the deposition of Ms. O'Donnell. The Court held two conference calls with the parties on the record and reviewed the three memoranda *in camera*. Based on the parties' arguments made during the conference calls and the Court's *in camera* review of the documents, the Court ruled that none of the memoranda were privileged. The Court nevertheless ruled that only the third memorandum, dated October 8, 2008, fell within the scope of discovery, as the first two memoranda did not specifically address Vice-Presidential records. *See* Min. Order dated Nov. 12, 2008. In contrast, the October 8, 2008 memorandum specifically referenced Vice-Presidential records and included at least one definition of what constituted a Vice-Presidential record. *Id.* Accordingly, the Court held that Plaintiffs could properly question Defendants' witnesses about the October 8, 2008 memorandum.

Plaintiffs deposed Ms. O'Donnell on November 13, 2008. Although the parties did not bring any issues to the Court's attention during or immediately after the deposition, Plaintiffs subsequently explained in a Joint Status Report that Ms. O'Donnell lacked any knowledge of the October 8, 2008 memorandum, and accordingly, that she could not answer any questions about it during her deposition.[10] The Court therefore granted Plaintiffs leave to re-depose Ms. Smith for the limited purpose of answering questions about the October 8, 2008 memorandum and ordered

---

[10] Plaintiffs' perception that Ms. O'Donnell lacked sufficient knowledge of the issues in this case led them to renew their request to depose David Addington, which the Court denied. *See* Order Setting Schedule For Further Proceedings at 6-10 (Nov. 20, 2008), Docket No. [38]. Because Plaintiffs again renew their arguments concerning the scope of Ms. O'Donnell's knowledge in their Cross-Motion for Summary Judgment, the Court shall address Plaintiffs arguments in that context.

that, if she also lacked knowledge of the memorandum, Defendants had to produce a copy of it to Plaintiffs at Ms. Smith's deposition.  Ms. Smith's re-deposition was taken without apparent incident, and the parties thereafter complied with the briefing schedule set by the Court.

Defendants filed a Motion to Dismiss under Federal Rules of Civil Procedure 12(b)(1) or 12(b)(6), or in the alternative, Motion for Summary Judgment under Rule 56(c), on December 8, 2008 ("Defs.' Mot.").  Plaintiffs filed an Opposition to Defendants' Motion to Dismiss, or in the alternative, Motion for Summary Judgment and a Cross-Motion for Summary Judgment under Rule 56(c) on December 22, 2008 ("Pls.' Opp'n").  Defendants filed a Reply in support of their Motion and an Opposition to Plaintiffs' Motion on December 31, 2008 ("Defs.' Reply").  Plaintiffs filed a Reply in support of their Motion on January 5, 2009 ("Pls.' Reply").  With briefing now fully completed, the parties' motions are ripe for decision.

## II.  LEGAL STANDARDS

A.      *Federal Rule of Civil Procedure 12(b)(1)*

Under Rule 12(b)(1), the plaintiff bears the burden of establishing that the court has jurisdiction.  *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001) (a court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority"); *see also Pitney Bowes, Inc. v. U.S. Postal Serv.*, 27 F. Supp. 2d 15, 19 (D.D.C. 1998).  A court must accept as true all factual allegations contained in the complaint when reviewing a motion to dismiss pursuant to Rule 12(b)(1), and the plaintiff should receive the benefit of all favorable inferences that can be drawn from the alleged facts.  *See Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993).  However, "'plaintiff's factual allegations in the complaint . . . will bear closer scrutiny in

resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim."
*Grand Lodge*, 185 F. Supp. 2d at 13-14 (quoting 5A Charles Alan Wright & Arthur R. Miller,
Federal Practice and Procedure § 1350).  Finally, "[a]lthough 'the District Court may in
appropriate cases dispose of a motion to dismiss for lack of subject matter jurisdiction under Fed.
R. Civ. P. 12(b)(1) on the complaint standing alone,' 'where necessary, the court may consider
the complaint supplemented by undisputed facts evidenced in the record, or the complaint
supplemented by undisputed facts plus the court's resolution of disputed facts.'"  *Coalition for
Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (quoting *Herbert v. Nat'l
Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992)); *see also Koutny v. Martin*, 530 F. Supp. 2d
84, 87 (D.D.C. 2007) (in resolving a motion to dismiss pursuant to Rule 12(b)(1), a court "may
also consider 'undisputed facts evidenced in the record'") (internal citations omitted).

     B.    *Federal Rule of Civil Procedure 12(b)(6)*

     The Federal Rules of Civil Procedure require that a complaint contain "'a short and plain
statement of the claim showing that the pleader is entitled to relief,' in order to 'give the
defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl.
Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1964 (2007) (quoting *Conley v. Gibson*, 355
U.S. 41, 47 (1957)).  In evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim,
the court must construe the complaint in a light most favorable to the plaintiff and must accept as
true all reasonable factual inferences drawn from well-pleaded factual allegations.  *In re United
Mine Workers of Am. Employee Benefit Plans Litig.*, 854 F. Supp. 914, 915 (D.D.C. 1994).

     While the court must construe the complaint in the plaintiff's favor, it "need not accept
inferences drawn by the plaintiff[] if such inferences are unsupported by the facts set out in the

complaint." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Moreover, the court is not bound to accept the legal conclusions of the non-moving party. *See Taylor v. FDIC*, 132 F.3d 753, 762 (D.C. Cir. 1997). The court is limited to considering facts alleged in the complaint, any documents attached to or incorporated in the complaint, matters of which the court may take judicial notice, and matters of public record. *See E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997); *Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 n.6 (D.C. Cir. 1993).

       C.     *Federal Rule of Civil Procedure 56(c)*

      Pursuant to Federal Rule of Civil Procedure 56, a party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). *See also Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). Under the summary judgment standard, the moving party bears the "initial responsibility of informing the district court of the basis for [its] motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which [it] believe[s] demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In response, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal citations omitted).

      Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is insufficient to bar summary

judgment.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  To be material, the

factual assertion must be capable of affecting the substantive outcome of the litigation; to be

genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-

fact could find for the nonmoving party.  *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C.

Cir. 1987); *Liberty Lobby*, 477 U.S. at 251 (the court must determine "whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided

that one party must prevail as a matter of law").  "If the evidence is merely colorable, or is not

sufficiently probative, summary judgment may be granted."  *Liberty Lobby*, 477 U.S. at 249-50

(internal citations omitted).  "Mere allegations or denials in the adverse party's pleadings are

insufficient to defeat an otherwise proper motion for summary judgment."  *Williams v.*

*Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996).  The adverse party must do more than simply

"show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Instead, while the movant bears the initial

responsibility of identifying those portions of the record that demonstrate the absence of a

genuine issue of material fact, the burden shifts to the non-movant to "come forward with

'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587 (citing Fed. R. Civ. P.

56(e)) (emphasis in original).

### III.  DISCUSSION

The Court shall consider the threshold legal arguments raised by Defendants' Motion to

Dismiss prior to reaching the merits of the parties' Cross-Motions for Summary Judgment.  *See,*

*e.g.*, *New England Pub. Commc'ns Council, Inc. v. Fed. Commc'ns Comm'n*, 334 F.3d 69, 73

(D.C. Cir. 2003) ("[b]efore considering the merits, [the court] must address the [defendant's]

threshold argument").

      *A.     Defendants' Motion to Dismiss*

Defendants' Motion to Dismiss raises three legal arguments:  (1) that judicial review of Plaintiffs' claims is precluded by the PRA; (2) that Plaintiffs' causes of action are legally deficient; and (3) that Plaintiffs lack standing.  The Court shall address these arguments in turn, with one caveat.  Because the Amended Complaint asserts Counts I and II against one set of Defendants (the Vice President, the OVP, and the EOP), and asserts Counts III and IV against another set (the Archivist and NARA), the Court shall separately discuss Defendants' second argument as to each of the two sets of Defendants.

      1.     <u>Judicial Review Under the Presidential Records Act</u>

Underlying much of Defendants' Motion to Dismiss is the argument that none of Plaintiffs' claims are legally cognizable because judicial review is entirely precluded by the PRA. To place this argument in context, the Court must first pause to discuss the basis of the Court's subject matter jurisdiction and Plaintiffs' causes of action.

It is axiomatic that a plaintiff must proffer a proper basis for both a federal court's exercise of jurisdiction and an independent cause of action under which to proceed.  In some instances, a plaintiff may be able to rely on the same federal statute for both.  *See, e.g.*, *Mwani v. Bid Laden*, 417 F.3d 1, 14 (D.C. Cir. 2005) (explaining that the Alien Tort Claims Act supplies both subject matter jurisdiction and a cause of action).  In other instances, a plaintiff must rely on more than one statute.  *See, e.g.*, *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 18 n.4 (D.C. Cir. 2006) ("the APA grants a cause of action rather than subject matter jurisdiction").  In this case, the Amended Complaint predicates jurisdiction on 28 U.S.C. § 1331,

which provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."[11]  It is well-established that this statute does not provide a plaintiff with an independent cause of action.  *See Mead Corp. v. United States*, 490 F. Supp. 405, 407 (D.D.C. 1980) (". . . section 1331 does not in itself create substantive rights or causes of action . . . but only confers jurisdiction on the district courts to hear certain cases that are supported by an independently created substantive cause of action"), *aff'd* 652 F.2d 1050, 1053 (D.C. Cir. 1980) ("[w]e agree with the district court that [1331 does not] provide[] an independent basis of federal jurisdiction").  Accordingly, for this Court to maintain federal jurisdiction under 28 U.S.C. § 1331, Plaintiffs must also advance a separate, legally cognizable cause of action.

The Amended Complaint asserts causes of action arising under three federal statutes:  the Declaratory Judgment Act, 28 U.S.C. § 2201, the Mandamus Act, 28 U.S.C. § 1361, and as to the Archivist and NARA, the APA, 5 U.S.C. §§ 701 *et seq.*  Plaintiffs rely on the duties and/or obligations imposed on Defendants by the PRA as the basis for each of these causes of action.  For example, under the Declaratory Judgment Act, Plaintiffs seek a declaration that Defendants have implemented guidelines for classifying documents that violate the PRA.  Under the Mandamus Act, Plaintiffs seek mandamus to require Defendants to change their guidelines to comply with the provisions of the PRA.

Against this background, Defendants argue that all of Plaintiffs' claims must be dismissed because judicial review of the PRA–on which all of Plaintiffs' causes of action rely–is

---

[11] The Amended Complaint also asserts jurisdiction under 28 U.S.C. § 1361 (Mandamus Act), 5 U.S.C. §§ 701, *et seq.* (APA), and 28 U.S.C. §§ 2201 (Declaratory Judgment Act).  The Court shall address each of these statutes below.

foreclosed.  *See* Defs.' Mot. at 18-23; Defs.' Reply at 9-21.  To support this argument,

Defendants place almost singular reliance on the D.C. Circuit's decision in *Armstrong v. Bush*,

924 F.2d 282 (D.C. Cir. 1991) (*Armstrong I*), blinding themselves to the D.C. Circuit's

subsequent decision in *Armstrong v. Executive Office of the President*, 1 F.3d 1274 (D.C. Cir.

1993) (*Armstrong II*).  Because Defendants' argument would be dispositive in this case if correct,

and because the parties both recognize that Defendants' argument is resolved almost entirely by

focusing on these two decisions, the Court shall discuss them in detail.

The *Armstrong* line of cases began in 1989 when several individuals and organizations

sought to prevent the destruction of materials created during the last two weeks of the Reagan

Administration and stored on a National Security Archive computer system, alleging that the

records had to be maintained pursuant to the Federal Records Act[12] ("FRA") or the PRA.

*Armstrong v. Bush*, 721 F. Supp. 343, 347 (D.D.C. 1989).  The district court held that the

plaintiffs could bring an action to force the President's compliance with the FRA and the PRA.

*Id.* at 348.  The district court also held that, "[a]lthough neither the PRA nor the FRA itself gives

rise to this cause of action, . . . the APA empowers a private plaintiff to seek judicial review of

presidential performance under these statutes."  *Id.*

The D.C. Circuit reversed in *Armstrong v. Bush*, 924 F.2d 282 (D.C. Cir. 1991)

(*Armstrong I*).  The Court reviewed the statutory and legislative history of the PRA and found

that it balanced two competing goals.  On the one hand, "Congress sought to establish the public

ownership of presidential records and ensure the preservation of presidential records for public

---

[12]   The FRA is actually a combination of several statutes.  *See* 44 U.S.C. §§ 2101-2118, 2901-2910, 2101-3107, and 3301-3324.

access after the termination of a President's term in office." *Id.* at 290 (citing H.R. Rep. No. 95-1487, 95th Cong., 2d Sess. 2 (1978), *reprinted in* 1978 U.S. Code Cong. & Admin. News 5732, 5733).  On the other hand, Congress sought to "minimize outside interference with the day-to-day-operations of the President and his closest advisors and to ensure executive branch control over presidential records during the President's term in office." *Id.*  Accordingly, the PRA requires the President to "maintain records documenting the policies, activities, and decisions of his administration," but leaves in his hands the "implementation of such a requirement." *Id.*  The Court therefore reversed the lower court's decision that the plaintiffs could challenge the President's "recordkeeping practices and decisions" because such judicial review "would upset the intricate statutory scheme Congress carefully drafted to keep in equipoise important competing political and constitutional concerns." *Id.* at 290-91.  In reaching this decision, the Court emphasized that Congress "presumably relied on the fact that subsequent Presidents would honor their statutory obligations to keep a complete record of their administrations." *Id.* at 290.

*Armstrong* was remanded to the district court to consider the plaintiffs' remaining claims that did not rely on enforcing the President's compliance with the PRA. *Id.* at 297.  The plaintiffs thereafter amended their complaint and asserted a claim that the National Security Council ("NSC") improperly classified certain records as Presidential (*i.e.*, documents falling under the PRA) when they should have instead been subject to the FRA. *Armstrong v. EOP*, 810 F. Supp. 335, 345 (D.D.C. 1993).  The district court declined to hear this claim because the D.C. Circuit "explicitly stated that . . . the NSC produces both presidential and federal records . . . [and] held that the PRA precludes judicial review . . . [of] actions taken by the President to ensure that presidential records are maintained." *Id.* at 347-48.

The D.C. Circuit again reversed in *Armstrong v. Executive Office of the President*, 1 F.3d 1274 (D.C. Cir. 1993) (*Armstrong II*).  The Court acknowledged that *Armstrong I* limits the scope of judicial review under the PRA, but explained that review was *not* precluded entirely.  *Id.* at 1293 ("[t]he *Armstrong I* opinion does *not* stand for the unequivocal proposition that all decisions made pursuant to the PRA are immune from judicial review").  To the contrary, "courts are accorded the power to review guidelines outlining what is, and what is not, a 'presidential record' under the terms of the PRA.  The PRA does not bestow on the President the power to assert sweeping authority over whatever materials he chooses to designate as presidential records without any possibility of judicial review."  *Id.*

The Court explained that *Armstrong I* concerned only the "creation, management, and disposal decisions" of the President, and *not* "the initial classification of existing materials."  *Id.* To avoid the confusion that has nevertheless manifested itself in the present case, the Court even defined the terms "creation, management, and disposal" decisions:

> A 'creation' decision refers to the determination to *make* a record documenting presidential activities.  Thus, the court may not review any decisions regarding *whether to create* a documentary presidential record.  'Management decisions' describes the day-to-day process by which presidential records are maintained.  The courts may likewise not review these particulars of the presidential records management system.  Finally, 'disposal decisions' describes the process outlined in 44 U.S.C. § 2203(c)-(e) for disposing of presidential records.  Judicial review of the President's actions under these provisions is also unavailable.  <u>But guidelines describing which *existing* materials will be treated as presidential records in the first place are subject to judicial review</u>.

*Id.* at 1294 (internal citations omitted, underlined emphasis added).  The Court therefore remanded to allow the district court to determine whether the guidelines at issue improperly classified Presidential records.  *Id.* at 1296.

Against this legal background, the Court shall now consider Defendants' contention that

"the PRA itself forecloses judicial review . . . ."  Defs.' Mot. at 18.  Arguing that *Armstrong I*

controls this case, Defendants suggest that *Armstrong II* only allows judicial review where a

plaintiff proceeds under the FOIA or the FRA, *and* where a plaintiff challenges guidelines that

may improperly encompass federal records.  *Id.* at 12 n.1, 19 (stating that *Armstrong II* "stands

for the limited holding that courts, in appropriate circumstances when presented with appropriate

FRA or FOIA-based claims, may review 'guidelines defining presidential records under the

rubric of substantive FOIA law' to ensure that federal records were not shielded from the reach

of FOIA by being classified as presidential records") (emphasis omitted).  In other words,

Defendant would confine *Armstrong II* to its facts, eviscerating its precedential value.  *See* Defs.'

Reply at 2 ("[*Armstrong II*] cannot be read more broadly than the context in which the Court's

decision was written").  The Court finds that Defendants' interpretation of *Armstrong II* is

untenable.

The distinction between *Armstrong I* and *Armstrong II*, according to the D.C. Circuit, was

the type of conduct the plaintiffs were seeking to challenge, not the vehicle by which plaintiffs

were challenging it.  That is, whether judicial review under the PRA was appropriate depended

on whether the plaintiffs sought review of the President's "creation, management, and disposal

decisions" (as to which judicial review was not available) or the President's guidelines applied to

the initial classification of documents (as to which review was available).  Whether a plaintiff

proceeds under the FOIA, the FRA, the APA, or any other statute is irrelevant to that distinction.

Accordingly, the Court agrees with Plaintiffs that the holding of *Armstrong II* "cannot be

reconciled with the narrow, 'FOIA or FRA-based' interpretations [D]efendants urge this Court to

adopt."  Pls.' Opp'n at 22.

Defendants' interpretation of *Armstrong II* also ignores other portions of the D.C. Circuit's opinion in that case. The Court identified its concern that records otherwise available to the public through FOIA would be improperly classified as Presidential records and possibly even destroyed without judicial review. 1 F.3d at 1292. Clearly, the Court's holding was meant "to ensure that materials that are not subject to the PRA are not treated as presidential records," *id.* at 1293, whereas this case presents the reverse situation – Plaintiffs seek to ensure that materials that are subject to the PRA are treated as Vice-Presidential records. The review undertaken by a court in each circumstance is nevertheless identical; a court must review the guidelines the executive uses to define records under the PRA.

In addition, the absence of judicial review could result in the same type of anomalous classification of records that gave the D.C. Circuit pause in *Armstrong II*. For example, the D.C. Circuit hypothesized that a President might define "Presidential records" to include "all records produced or received by, or in the possession or under the control of, any government agency or employee of the United States." *Id.* at 1293. If this definition were implemented without the possibility of judicial review, it would "be tantamount to allowing the PRA to functionally render the FOIA a nullity." *Id.* A similar hypothetical may be constructed in this case. Suppose the Vice President created guidelines for preserving records wherein he defined Vice-Presidential records as consisting only of "hand-written documents concerning the ceremonial duties of the Vice President." Such a definition would clearly controvert the language of the PRA (which does not distinguish between electronic, hard-copy, or hand-written records, and which defines Vice-Presidential records to include those related to the Vice President's constitutional, statutory, or other official or ceremonial duties). Yet, if judicial review were unavailable, almost all of the

31

records that Congress sought to have maintained under the PRA would be susceptible to destruction as personal and not Vice-Presidential records. That result is not only illogical in light of Congress' decision to include a clear definition of records falling under the PRA, *see* 44 U.S.C. § 2201, but it also conflicts with the D.C. Circuit's discussion in *Armstrong II* suggesting that the executive suffers no undue interference where a court's inquiry does not call into question the President's "day-to-day operations." 1 F.3d at 1292.

The above hypothetical is not far removed from the facts of *American Historical Association v. Peterson*, the only other decision in this district to discuss the interplay between *Armstrong I* and *Armstrong II*. 876 F. Supp. 1300, 1313-15 (D.D.C. 1995). In that case, President George H.W. Bush reached an agreement with the Archivist to treat his electronic records as the President's personal records subject to his control. *Id.* at 1303. The plaintiffs brought suit alleging that the agreement violated the PRA, Article II of the Constitution, and the APA. *Id.* Although the defendants argued that judicial review of these claims was precluded by *Armstrong I*, *id.* at 1313, the court disagreed:

> *Armstrong II* held that guidelines for categorizing Presidential records are subject to judicial review 'to ensure that materials that are not subject to the PRA are not treated as Presidential records.' Accordingly, in turn, the Court observes that *Armstrong II* does not necessarily foreclose judicial review of a decision to denominate certain materials 'personal records' of a former President. Such judicial review may be available to ensure that Presidential records are not disposed of as personal records at the end of an Administration and that, instead, all Presidential records fall subject to the Archivist's 'affirmative duty to make such records available to the public.'

*Id.* at 1314 (quoting 44 U.S.C. § 2203(f)(1) (emphasis omitted)). The Court therefore reviewed the agreement at issue and found that it violated the PRA. *Id.*

Defendants seek to distinguish *American Historical Association* because the plaintiffs'

claims were focused on the Archivist's compliance with the PRA and the lawsuit involved the records of a former President.  *See* Defs.' Reply at 13 (quoting *Am. Historical Ass'n*, 876 F. Supp. at 1315).[13]  Although the focus in that case was certainly not identical to this one, the reasoning of *American Historical Association* is equally applicable.  The court reasoned that

> it borders on the absurd to posit that Congress–in passing a statute to preclude former Presidents from disposing of Presidential records at will, and affording Presidents no discretion to restrict access to records after leaving office–intended that a former President's post-term decisions regarding disposal of such records be immune from judicial review.

876 F. Supp. at 1315.  The same may be said here.  The PRA defines Vice-Presidential records to include "documentary materials . . . created or received by the President, his immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise and assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President."  44 U.S.C. § 2201(2).  Pursuant to the PRA, the Vice President is directed to "take all such steps as may be necessary to assure that the activities, deliberations, decisions, and policies that reflect the performance of his constitutional, statutory, or other official or ceremonial duties are adequately documented and that such records are maintained as Presidential records . . . ."  *Id.* §§ 2203, 2207.  The Court finds that it "borders on the absurd" to believe that Congress statutorily defined Vice-Presidential records and required the Vice President to implement steps to preserve them, but denied any judicial review to prevent the Vice President from using a different definition for Vice-Presidential records.

_____

[13] Although Defendant is correct that President George H.W. Bush was no longer in office when the court reached its decision, the agreement at issue was apparently signed on the last day of his term in office.  *See Am. Historical Ass'n*, 876 F. Supp. at 1304.

Finally, although Defendants identify multiple passages from *Armstrong I* where the D.C. Circuit explained how or why Congress "declined to give outsiders the right to interfere with White House recordkeeping practices," 924 F.2d at 290, Plaintiffs' claims in this case do not implicate Defendants' "recordkeeping practices." *See Armstrong II*, 1 F.3d at 1294 (defining the creation, management, and disposal decisions contemplated by *Armstrong I*). Rather, Plaintiffs allege that "the [V]ice [P]resident and the OVP have adopted policies and guidelines that exclude from the reach of the PRA all but a narrow category of [Vice-Presidential] records created or received in the very limited circumstances in which the [V]ice [P]resident deems himself to be acting as part of the executive branch." Am. Compl. ¶ 35. Plaintiffs also allege that "NARA has adopted policies and guidelines, without the benefit of public notice and comment, that exclude from the reach of the PRA records generated or received by [V]ice [P]residents in their congressional capacities, *i.e.*, when they preside over the Senate. *Id.* ¶ 37. The result, according to Plaintiffs, is that NARA considers the congressional records of Vice President Cheney "to be his personal records that he is free to dispose of at will." *Id.* ¶ 38. As a result of these policies and guidelines, Plaintiffs allege that a significant number of records that should be preserved under the PRA will be destroyed at the conclusion of this Presidential Administration. *Id.* ¶¶ 41, 44. These allegations fall squarely within the types of claims concerning "guidelines describing which *existing* materials will be treated as presidential records" that are subject to judicial review. *Armstrong II*, 1 F.3d at 1294. Accordingly, the Court finds that the PRA does *not* preclude judicial review of Plaintiffs' claims.

## 2. Causes of Action Against the Vice President, OVP, and EOP

Before discussing the causes of action pled in Plaintiffs' Amended Complaint, the Court

must first address two causes of action that Plaintiffs did *not* plead but that Defendants have nevertheless moved to dismiss.  First, Defendants' Motion to Dismiss argues that the PRA does not provide Plaintiffs with a direct cause of action and that the Court should refrain from finding an implied cause of action in the PRA.  *See* Defs.' Mot. at 11-13.  Because Plaintiffs' Amended Complaint did not plead a cause of action directly under the PRA (but rather only under the Declaratory Judgment Act and Mandamus Act), this argument appears at first glance to be a non-sequitur.  Plaintiffs' initial arguments in their Opposition seem to support this conclusion.  *See* Pls.' Opp'n at 16 (arguing that Plaintiffs "have a judicially remediable right under the PRA that may be enforced through the [Declaratory Judgment Act]," and presumably also the Mandamus Act).  Confusingly, Plaintiffs then proceed to argue that "the structure, language and legislative intent of the PRA support the creation of a private right of action," Pls.' Opp'n at 17, which suggests that Plaintiffs are, in fact, asking this Court to imply a private cause of action in the PRA.

Plaintiffs' argument in this regard is puzzling.  The Amended Complaint pled causes of action under the Declaratory Judgment Act and the Mandamus Act, but it contained no cause of action directly under the PRA.  *See* Am. Compl. ¶¶ 47-72 (setting forth Plaintiffs' four claims for relief).  It is well-established that a plaintiff cannot add or amend claims through an opposition to a motion for summary judgment.  *See, e.g.*, *DSMC, Inc. v. Convera Corp.*, 479 F. Supp. 2d 68, 84 (D.D.C. 2007) (rejecting plaintiff's attempts to broaden claims and thereby amend its complaint in opposition to defendant's motion for summary judgment).  Additionally, Plaintiffs may seek to obtain relief for PRA violations through one of the causes of action that they have actually pled, as even Defendants concede.  *See* Defs.' Reply at 18 ("the absence of a private

35

right of action under the PRA alone does not necessarily foreclose mandamus relief . . .").  *Cf. Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 150 n.5 (1980) (declining to imply a cause of action in the FRA but recognizing that other causes of action, such as the APA, may create other avenues for recovery).

Even if the Court were to entertain a new claim arising directly under the PRA, it would decline Plaintiffs' request to imply such a cause of action.  The Supreme Court has explained that "[p]rivate rights of action to enforce federal law must be created by Congress," *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) (citation omitted), and "the fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 568 (1979) (internal quotation marks and citation omitted).  The Court must therefore consider whether the PRA "displays an intent to create not just a private right but also a private remedy." *Sandoval*, 532 U.S. at 286 (citation omitted).

Although the PRA certainly creates ministerial obligations for the President and Vice-President, and although Plaintiffs are undoubtedly correct that the PRA was enacted to ensure the preservation of Presidential records for "scholars, journalists, researchers and citizens of our own and future generations," Pls.' Opp'n at 17 (quoting 124 Cong. Rec. H34894 (daily ed. Oct. 10, 1978) (Statement of Rep. Brademas)), the statute nevertheless does not contain language evincing a Congressional intent to allow suits by private plaintiffs proceeding directly thereunder.  The Supreme Court has explained that the private right of action inquiry must focus on whether the *statutory text* "[is] 'phrased in terms of the persons benefitted.'" *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002) (quoting *Cannon v. Univ. of Chicago*, 441 U.S. 677, 692 n.13 (1979)).

36

Here, Plaintiffs submit that the PRA defines "the persons benefitted" in 44 U.S.C. § 2202, the provision stating that "[t]he United States shall reserve and retain complete ownership, possession, and control of Presidential records."  *See* Pls.' Reply at 4.  The Court finds that a phrase vesting ultimate ownership of Presidential records with the United States cannot be read to evince a Congressional intent to create private causes of action under the PRA.  Accordingly, even if Plaintiffs' Amended Complaint had asserted an implied cause of action directly under the PRA, the Court would dismiss it.

Finally, Defendants' Motion to Dismiss also seeks dismissal of Plaintiffs' APA claims against the Vice President, the OVP, and the EOP.  *See* Defs.' Mot. at 16-25.  The Amended Complaint contains no such claims, and Plaintiffs confirm in their Opposition that they rely on the provisions of the APA only for their claims against the Archivist and NARA.  *See* Pls.' Opp'n at 2 ("Plaintiffs rely on the APA only for their claims against the [A]rchivist and NARA, while their claims against [the Vice President], the OVP and the [EOP] seek a declaratory judgment under the Declaratory Judgment Act [] and a writ of mandamus").  Accordingly, the Court shall deny Defendants' Motion to Dismiss on this ground.

Having dealt with the causes of action that were not contained in the Amended Complaint, the Court shall now turn to the two causes of action that Plaintiffs *did* advance against the Vice President, the OVP, and the EOP.[14]

i.      The Mandamus Act

Count II of the Amended Complaint seeks relief against the Vice President and the OVP

---

[14] The Court shall address Plaintiffs' claim for mandamus (Count II) prior to addressing their claim for declaratory relief (Count I).

37

pursuant to the Mandamus Act, 28 U.S.C. § 1361.  Plaintiffs seek a writ of mandamus to require "Vice President Cheney and the OVP to comply with their statutory duty to treat as subject to the PRA all records of the [V]ice [P]resident and his office that relate to the exercise of his constitutional, statutory and other official or ceremonial duties."  *Id.* ¶ 58.[15]

Under the Mandamus Act, a district court may "compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."  *In re Medicare Reimbursement Litig.*, 414 F.3d 7, 10 (D.C. Cir. 2005) (quoting 28 U.S.C. § 1361)).  Although mandamus is an "extraordinary remedy" and is used "only in the clearest and most compelling cases," *Cartier v. Sec'y of State*, 506 F.2d 191, 199 (D.C. Cir. 1974), the showing necessary to obtain mandamus is not inherently preclusive.  A court may issue mandamus where "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear [*i.e.* ministerial] duty to act; and (3) there is no other adequate remedy available to the plaintiff."  *In re Medicare Reimbursement Litig.*, 414 F.3d 7 at 10 (quoting *Power v. Barnhart*, 292 F.3d 781, 784 (D.C. Cir. 2002)).  Even where a court finds these legal requirements have been satisfied, mandamus should issue only where the court also finds "'compelling . . . equitable grounds'" justifying the remedy.  *Id.* (quoting *13th Reg'l Corp. v. U.S. Dep't of the Interior*, 654 F.2d 758, 760 (D.C. Cir. 1980)).

Defendants argue that Plaintiffs' mandamus claim should be dismissed because the duties imposed on Defendants by the PRA are not sufficiently ministerial.  *See* Defs.' Mot. at 14-15;

---

[15] Plaintiffs reference the All Writs Act, 28 U.S.C. § 1651(a), in their Opposition, *see* Pls.' Opp'n at 23, which is different from the Mandamus Act, 28 U.S.C. § 1361, on which they rely in their Amended Complaint.  Although Plaintiffs fail to explain the applicability of the All Writs Act in this case, *see Telecomm. Research & Action Ctr. v. FCC*, 750 F.2d 70, 77 (D.C. Cir. 1984) (explaining that the All Writs Act "permits a court to issue writs in aid of jurisdiction acquired to grant some other form of relief"), the analysis in Plaintiffs' Opposition is applicable to their claim under the Mandamus Act despite the reference to the All Writs Act.

Defs.' Reply at 19 ("the PRA does not impose the type of ministerial duty appropriate for mandamus relief").  Relying on 44 U.S.C. § 2203, Defendants acknowledge that the PRA requires Defendants to take steps to preserve Vice-Presidential records, but contend that Congress vested complete discretion with the Vice President as to how that requirement is to be implemented.  *See* Defs.' Mot. at 15.  In Opposition, Plaintiffs argue that the key ministerial obligation of Defendants (as it relates to the preservation of Vice-Presidential records) is found in 44 U.S.C. § 2201, which sets forth the definition of Vice-Presidential records.  *See* Pls.' Opp'n at 25.  In this regard, Plaintiffs argue that Congress left the Vice President with *no* discretion to alter the definition of Vice-Presidential records.  *Id.*

The parties' reply briefs sharpen these arguments.  Defendants argue that Plaintiffs have proved too much – "if [the] definitional provision [in Section 2201] were sufficient to establish a right to mandamus review, a mandamus action to order the President or Vice President to preserve (and not dispose of) any specific record . . . would be reviewable as well.  But that is not, of course, contemplated by the PRA."  Defs.' Reply at 19.  Defendants surmise that "[t]he definitional provision is, instead, implemented through the discretionary provisions of section 2203 of the PRA," *id.*, and that "[a]ny order requiring the Vice President or the OVP to rely on guidelines containing any specific definitions [] would tread on 'Congress' carefully crafted balance of [vice] presidential control of records creation, management and disposal during the [Vice] President's term of office and public ownership and access to the records after the expiration of the [Vice] President's term.'"  Defs.' Reply at 20 (quoting *Armstrong I*, 924 F.2d at 291).  Plaintiffs rejoin by arguing that "[w]hatever discretion the [Vice President] enjoys over the creation, management and disposal of his records does not extend to the exclusion of entire

classes of records from the PRA." Pls.' Reply at 12. Accordingly, "the [V]ice [P]resident may

have discretion in applying the definition with respect to particular documents – *i.e.*, deciding

whether or not a document is a [Vice-Presidential] record – but he has no discretion to alter the

definition of [Vice-Presidential] records at the outset and nothing in section 2203 of the Act

suggests otherwise." Pls.' Reply at 12.

 The Court agrees with Plaintiffs. The PRA contains a statutorily-imposed definition of

Vice-Presidential records:

> documentary materials, or any reasonably segregable portion thereof, created or
> received by the [Vice] President, his immediate staff, or a unit or individual of the
> Executive Office of the President whose function is to advise and assist the [Vice]
> President, in the course of conducting activities which relate to or have an effect
> upon the carrying out of the constitutional, statutory, or other official or
> ceremonial duties of the [Vice] President.

44 U.S.C. § 2201(2). The PRA also requires the Vice President to take steps to assure that Vice-

Presidential records, as they are defined in the PRA, are appropriately maintained and preserved.

*Id.* § 2203(a) ("the [Vice] President shall take all such steps as may be necessary to assure . . .

that such records are maintained as [Vice-] Presidential records"), § 2207 ("[t]he duties and

responsibilities of the Vice President, with respect to Vice-Presidential records, shall be the same

as the duties and responsibilities of the President under [the PRA] with respect to Presidential

records"). Because the PRA provides a definition for Vice-Presidential records and requires the

Vice President to preserve them, the Court finds that the Vice President has a ministerial

obligation to preserve Vice-Presidential Records as they are defined in the PRA.

 It is clear, as Defendants emphasize, that the Vice President has discretion concerning the

decision to create or dispose of Vice-Presidential records, and even how he chooses to preserve

them. *See Armstrong II*, 1 F.3d at 1294. But absent from the Vice President's discretion is his

ability to *change* the definition of Vice-Presidential records provided by Congress when exercising his obligations under the PRA – and that is precisely what Plaintiffs allege has occurred.  The Amended Complaint avers that "the [V]ice [P]resident and the OVP have adopted policies and guidelines that exclude from the reach of the PRA all but a narrow category of [Vice-Presidential] records created or received in the very limited circumstances in which the [V]ice [P]resident deems himself to be acting as part of the executive branch."  Am. Compl. ¶ 35. Plaintiffs assert that the consequence of these policies and guidelines is that a significant number of records that should be preserved under the PRA will be destroyed at the conclusion of this Presidential Administration.  *Id.* ¶¶ 41, 44.

Defendants do not argue that the Vice President has the authority to alter the definition of Vice-Presidential records provided in the PRA, nor could they sustain such an argument.  *See generally* Defs.' Mot.; Defs.' Reply.  The PRA is a statute enacted by Congress and cannot be disregarded as a mere suggestion on its part.  While Congress sought to balance "the public ownership of presidential records" with the need "to minimize outside interference with the day-to-day operations of the President and his closest advisors," *Armstrong I*, 924 F.2d at 290, Congress did not grant the Vice President the discretion to apply whatever definition of Vice-Presidential records he decided suited him when undertaking his preservation obligations.  This distinction is reflected in the D.C. Circuit's *Armstrong* decisions, which explain why the Vice President's discretionary "creation, management, and disposal decisions" are not subject to judicial review,  *Armstrong II*, 1 F.3d at 1294, while the Vice President's "guidelines outlining what is, and what is not, a 'presidential record' under the [non-discretionary definition of Vice-Presidential records] of the PRA" are judicially reviewable, *id.* at 1290.

41

Accordingly, the Court finds that Plaintiffs have identified a ministerial obligation that may form the basis for their mandamus claim.  The Court shall therefore deny Defendants' Motion to Dismiss Count II from the Amended Complaint on that basis.

ii. The Declaratory Judgment Act

Count I of the Amended Complaint seeks relief against the Vice President, the OVP, and the EOP under the Declaratory Judgment Act, 28 U.S.C. § 2201.  Plaintiffs seek a declaration that

> guidelines of the [V]ice [P]resident, the OVP, and the EOP implementing the PRA in a manner that excludes from its reach the records that the [V]ice [P]resident and his office create and receive in the course of conducting activities relating to or having an effect on the carrying out of the [V]ice [P]resident's constitutional, statutory or other official or ceremonial duties and their implementation of those guidelines are contrary to the law.

Am. Compl. ¶ 52.  Defendants argue that Plaintiffs' Declaratory Judgment Act claim must be dismissed because the Declaratory Judgment Act is a procedural statute that only expands the scope of available remedies to a plaintiff but does not create an independent cause of action.  *See* Defs.' Mot. at 13.

The Declaratory Judgment Act provides, in relevant part, that

> [i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a).  District courts "possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 283 (1995).

Defendants correctly explain that the Supreme Court has interpreted this statute as

"procedural only," *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950) (quoting

*Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 240 (1937)), and that it

"presupposes the existence of a judicially remediable right," *Schilling v. Rogers*, 363 U.S. 666,

677 (1960)). The D.C. Circuit has also acknowledged that the Declaratory Judgment Act "is not

an independent source of federal jurisdiction." *C&E Servs., Inc. of Wash. v. D.C. Water & Sewer*

*Auth.*, 310 F.3d 197, 201 (D.C. Cir. 2002).

Plaintiffs argue that the Declaratory Judgment Act provides them with an appropriate

cause of action for two reasons. First, Plaintiffs argue that the "plain language" of the

Declaratory Judgment Act provides an independent cause of action when: (1) there is a case or

actual controversy; (2) the case is within the court's jurisdiction; and (3) an appropriate pleading

has been filed. Pls.' Opp'n at 14 (citing 28 U.S.C. § 2201(a)). Because this "suit meets all three

requirements," Plaintiffs argue that they have asserted a legally cognizable claim under the

Declaratory Judgment Act. *Id.* Second, Plaintiffs rely on *Committee on the Judiciary, United*

*States House of Representatives v. Miers*, 558 F. Supp. 2d 53, 81 (D.D.C. 2008), a decision in

which Judge John D. Bates allowed the plaintiffs to proceed under the Declaratory Judgment Act

to remedy a violation of a Constitutional right. *See* Pls.' Opp'n at 14-15; Pls.' Reply at 11.

Fortunately, this is one dispute that the Court does not need to resolve. Plaintiffs have not

only asserted a cause of action against the Vice President, the OVP, and the EOP based on the

Declaratory Judgment Act, but also the Mandamus Act. Where a plaintiff advances a legally

cognizable claim for mandamus, the plaintiff necessarily also advances a cause of action on

which declaratory relief may lie:

> this Court may, if it believes it more appropriate, refrain at this time from issuing
> a writ of mandamus to [the defendant] and opt instead to act pursuant to the

> provisions of the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 (1970).
> That Act does not itself provide an independent subject matter jurisdictional base
> . . . But because in this case subject matter jurisdiction is present under section
> 1361 [the Mandamus Act], this Court may utilize the tool of declaratory relief.

*Nat'l Treasury Employees Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974) (internal citation

omitted).  Because Plaintiffs have stated a legally cognizable claim for mandamus relief that

survives Defendants' Motion to Dismiss, it is irrelevant whether or not the Declaratory Judgment

Act may itself constitute an independent cause of action.  The Court shall therefore deny

Defendants' Motion to Dismiss Count I of Plaintiffs' Amended Complaint on this basis.[16]

### 3.   Causes of Action Against the Archivist and NARA

The Court shall combine its discussion of Counts III and IV because the claims are

subject to the same legal analysis.  Count III seeks declaratory relief against the Archivist and

NARA for implementing PRA guidelines that improperly exclude the legislative records of the

Vice President from the definition of Vice-Presidential records, and because the guidelines

violate the APA.  Am. Compl. ¶ 62.  To the extent the Archivist and NARA have not yet

implemented their guidelines, Plaintiffs seek a declaration that the guidelines are unlawful and

may not be implemented.  *Id.* ¶ 65.  Count IV seeks mandamus relief against the Archivist and

NARA to require compliance "with their statutory duty to treat as subject to the PRA [the]

records of the [V]ice [P]resident and his office that relate to the carrying out of his legislative

functions and duties."  *Id.* ¶ 71.

---

[16] The Court notes that the Amended Complaint asserts Count II (mandamus) against the
Vice President and the OVP but omits reference to the EOP.  This omission appears to be an
editing error because Plaintiffs' Opposition argues that this claim is asserted against "the White
House defendants," Pls.' Opp'n at 23, which would appear to encompass the EOP.  Regardless,
any claims Plaintiffs have against the EOP are subject to dismissal based on standing, as
discussed below.  *See* Section III.A.4, *infra*.

Defendants argue that Counts III and IV must be dismissed because neither the Archivist nor NARA has any authority to affect the classification guidelines used by the Vice President, the OVP, or the EOP to classify Vice-Presidential records. Defs.' Mot. at 17. Relying on the D.C. Circuit's discussion in *Armstrong I* and the statutory language of the PRA, Defendants emphasize that neither the Archivist nor NARA "has the authority 'to veto the [Vice] President's disposal decisions,' [or] 'inspect the [Vice] President's records or survey the [Vice] President's records management practices.'" *Id.* (quoting *Armstrong I*, 924 F.2d at 290). Accordingly, Defendants argue that the Plaintiffs "are unable to show redressability for their claims," *i.e.*, a "'substantial likelihood' that the requested relief will remedy the alleged injury in fact.'" *Id.* (quoting *Vermont Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000) (internal citation omitted)).

Plaintiffs' perfunctory response in their Opposition is that NARA has issued guidelines defining Vice-Presidential records "for purposes of the PRA . . . and promulgated pursuant to the authority granted to NARA by the PRA." Pls.' Opp'n at 27-28 (citing 36 C.F.R. § 1270.14(d); 53 Fed. Reg. 50404 (Dec. 15, 1988)). As a result, Plaintiffs argue that "either [D]efendants are wrong in their assertion that NARA lacks authority to 'promulgate guidelines regarding the scope of Vice President Cheney's records subject to the PRA, or those regulations are ultra vires.'" *Id.* at 28 (citing Defs.' Mot. at 12 n.3) (internal citation and quotation marks omitted)). Plaintiffs repeat (but do not elaborate on) this argument in their Reply brief. *See* Pls.' Reply at 13-14.[17]

---

[17] The parties also dispute whether Plaintiffs have established that any NARA policy or guideline has injured them, citing the deposition testimony of Claire O'Donnell and Nancy Kegan Smith. *See* Defs.' Reply at 21; Pls.' Reply at 15. Because the Court's resolution of Defendants' Motion to Dismiss is based on the facts as alleged in the Amended Complaint and not the information the parties learned through discovery, *see E.E.O.C. v. St. Francis Xavier*

Plaintiffs eschew reliance on the statutory text of the PRA in both their Opposition and Reply, which is understandable.  The PRA's text undermines Plaintiffs' claims because it contemplates a very limited role for the Archivist and NARA *during* a Vice President's term in office.  In particular, Section 2203 of the PRA provides that, if the Vice President chooses to dispose of any Vice-Presidential records during his term in office, he must first obtain "the views, in writing, of the Archivist concerning the proposed disposal of such [Vice-] Presidential records."  44 U.S.C. § 2203(c).  "If the Archivist thinks it advisable, []he may notify Congress of the [Vice] President's intent to dispose of the records; and if the Archivist notifies Congress, the [Vice] President must submit the disposal schedules to the appropriate congressional committees and wait sixty days before destroying the records."  *Armstrong I*, 924 F.2d at 286.  The PRA contemplates no other role for the Archivist or NARA during the Vice President's term in office.

This limited notice authority led the D.C. Circuit in *Armstrong I* to conclude that the Archivist also had no authority to block any Vice-Presidential disposal decisions:

> Although the President must notify the Archivist before disposing of records and the Archivist may inform Congress of the President's desire to dispose of the records, neither the Archivist nor the Congress has the authority to veto the President's disposal decision[s].

*Armstrong I*, 924 F.2d at 290.

Clearly, Plaintiffs in this case challenge the guidelines used by the Vice President, the OVP, and the EOP to classify records (as opposed to any particular disposal decisions), but there is a similar dearth of statutory authority granting the Archivist or NARA *any* role in approving or disapproving the implementation of classification guidelines.  *See* 44 U.S.C. § 2201 *et seq.*  Only

---

*Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997), this dispute is of no moment.

*after* the Vice President has left office does the Archivist's role under the PRA expand.  *See* 44 U.S.C. § 2203(f)(1) ("[u]pon the conclusion of a President's term of office . . . the Archivist of the United States shall assume responsibility for the custody, control, and preservation of, and access to, the Presidential records of that President").[18]

Because the PRA vests almost no authority in the Archivist and NARA over Vice-Presidential records during the Vice President's term in office, the Court agrees with Defendants that Plaintiffs cannot obtain the relief they seek based on Counts III and IV of the Amended Complaint.[19]  Plaintiffs' reliance on implementing regulations, *see* Pls.' Reply at 14, does not change this analysis.  Nothing in the regulations could grant authority to the Archivist and NARA to undertake activities that Congress did not authorize in the PRA.  *See, e.g.*, *Health Ins. Ass'n of Am. v. Shalala*, 23 F.3d 412, 413 (D.C. Cir. 1994) (invalidating two regulations because they exceeded the statutory authority delegated by Congress).  Moreover, Defendants are correct that nothing in those regulations support "oversight" authority for the Archivist or NARA, nor any obligation of the Vice President, the OVP, or the EOP to follow classification guidance from the

_____

[18] Although Plaintiffs do not make the argument, one could argue that the formulation of improper classification guidelines by the Archivist and NARA might cause the Archivist to unlawfully abdicate his obligations under the PRA to notify Congress of the Vice President's disposal decisions.  Such a claim would fail in this case.  The Archivist's duty to notify Congress is triggered when a Vice President gives notice of his intent to destroy Vice-Presidential records. *See* 44 U.S.C. § 2203(c)-(e).  Here, Plaintiffs claim that the Vice President is unlawfully excluding records from the definition of Vice-Presidential records under the PRA.  *See* Am. Compl. ¶ 1.  Thus, if the Vice President chooses to dispose of a record that he classifies as a non-Vice-Presidential record, the PRA, as enacted, would *not* trigger the notice requirements of Section 2203, and the Archivist would have no opportunity to provide Congress with notice. Accordingly, even if Plaintiffs had made this argument, it would fail in this case.

[19] This legal deficiency reflects both a lack of "redressability,"as Defendants have argued, *see* Defs.' Mot. at 17, and also a lack of causation, *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

Archivist and NARA during the Vice President's term in office.  *See* Defs.' Reply at 22.

The Court understands Plaintiffs' exasperation with "a law to preserve [P]residential records for public ownership and access [that] leaves it to the total discretion of the [P]resident and [V]ice [P]resident to define what constitutes a [Vice-] [P]residential record in the first place."  Pls.' Reply at 13.  The Court is nevertheless bound to apply the PRA as Congress enacted it.  In doing so, the Court is left with the undeniable conclusion that Congress vested almost no authority in the Archivist and NARA over Vice-Presidential records during a Vice President's term in office.  If such a statutory scheme gives Plaintiffs pause, their redress is to Congress and not this Court.  Accordingly, the Court shall grant Defendants' Motion to Dismiss Counts III and IV of the Amended Complaint under Federal Rule of Civil Procedure 12(b)(6).[20]

### 4.    Plaintiffs' Standing

At this point, the Court has ruled that Plaintiffs may proceed with Count I (declaratory judgment) and Count II (mandamus) against the Vice President, the OVP, and the EOP, but has dismissed Count III (declaratory judgment) and Count IV (mandamus) against the Archivist and NARA.  The Court now must consider Defendants' remaining threshold argument that Plaintiffs lack standing to pursue these remaining claims.  *See* Defs.' Mot. at 25-38.

In order to satisfy constitutional standing requirements, a plaintiff must establish:  (1) that

---

[20] The parties' briefs include a recurring argument as to whether Defendants' Motion to Dismiss should be viewed under Federal Rule of Civil Procedure 12(b)(1) (relating to subject-matter jurisdiction) or 12(b)(6) (relating to the failure to state a claim).  The latter is the proper procedural vehicle for dismissing Plaintiffs' claims against the Archivist and NARA because the claims are not "'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy.'"  *Steel Co. v. Citizens for a Better Environ.*, 523 U.S. 83, 89 (1998) (quoting *Oneida Indian Nation of N.Y. v. County of Oneida*, 414 U.S. 661, 666 (1974)).

it has suffered an injury in fact, which is the invasion of a legally protected interest that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there is a causal connection between the injury and the conduct at issue, such that the injury is fairly traceable to the challenged act; and (3) that it is likely, as opposed to speculative, that the injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 560-61.  To establish prudential standing, a plaintiff must show "only that its 'interest is arguably one regulated or protected by the statutory provision at issue.'" *Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 600 (D.C. Cir. 2007) (internal quotation marks omitted).

Where a plaintiff also seeks injunctive or declaratory relief, a plaintiff "must allege a likelihood of future *violations* of [its] rights . . . , not simply future *effects* from past violations." *Fair Employment Council*, 28 F.3d at 1273.  "'Because injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party alleges, and ultimately proves, a real and immediate–as opposed to merely conjectural or hypothetical–threat of future injury.'" *Natural Res. Def. Council v. Pena*, 147 F.3d 1012, 1022 (D.C. Cir. 1998) (quoting *Church v. City of Huntsville*, 30 F.3d 1332, 1337 (11th Cir. 1994)).  *See also City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) ("Lyons' standing to seek the injunction requested depended on whether he was likely to suffer future injury . . . .").

Plaintiffs bear the burden of demonstrating that they have standing to bring suit with respect to each of their claims.  *See Lujan*, 504 U.S. at 561 ("The party invoking federal jurisdiction bears the burden of establishing [the] elements [of standing].").  Plaintiffs need not show that each plaintiff has standing to assert every claim; rather, "if constitutional and prudential standing can be shown for at least one plaintiff, [the court] need not consider the

standing of the other plaintiffs to raise that claim." *Mountain States Legal Found. v. Glickman*,

92 F.3d 1228, 1221 (D.C. Cir. 1996) (citing *Watt v. Energy Action Educ. Found.*, 454 U.S. 151,

160 (1981)).  Accordingly, the limited question the Court must now consider is whether at least

one of the Plaintiffs has standing to assert the remaining claims against the Vice President, the

OVP, and the EOP.

i. Actual or Imminent Injury in Fact

Defendants argue that Plaintiffs lack an imminent injury because they have only a

speculative or hypothetical interest in seeking future access to Vice-Presidential records.  *See*

Defs.' Mot. at 27.  Relying on *American Historical Association v. National Archives & Records

Administration*, 310 F. Supp. 2d 216 (D.D.C. 2004) (Kollar-Kotelly, J.), and *CREW v.

Department of Homeland Security*, 527 F. Supp. 2d 101 (D.D.C. 2007), Defendants claim that

Plaintiffs allege only the alliterative "speculative future harm from future, indeterminate record

requests." Defs.' Mot. at 28.  And while Defendants concede (as they must) that Plaintiff Stanley

Kutler intends to use Vice President Cheney's records for his research activities, Defendants

nevertheless contend his declaration is too "oblique[]" and not sufficiently "unambiguous[]."

Defs.' Reply at 25.

Plaintiffs argue that their potential harm is imminent and not speculative because

Defendants' failure to comply with the PRA would result in an irretrievable loss of documents

and Plaintiffs' inability to use the documents in the future.  *See* Pls.' Opp'n at 30.  In Plaintiffs'

view, requiring them "to wait until the [V]ice [P]resident has actually destroyed [Vice-

Presidential records] or transferred them out of his control in reliance on his unlawful guidelines

[would] effectively deprive [P]laintiffs of any relief, as the records they seek [would] be

50

irretrievably lost to [P]laintiffs and to history." *Id.*

The Court finds that Plaintiff Stanley Kutler, the E. Gordon Fox Emeritus Professor of American Institutions and Professor of Law at the University of Wisconsin, has established standing to advance Plaintiffs' claims.[21]   *See* Pls.' Reply to Defs.' Opp'n to Pls.' Mot. for PI, Ex. 1 ¶ 1 (hereinafter the "Decl. of S. Kutler").  Professor Kutler has authored numerous books, papers, and plays about American Presidents.[22]  *Id.* ¶ 2.  As part of his research, he "make[s] extensive use of the records of former presidents and vice presidents at presidential libraries and other [NARA] facilities." *Id.* ¶ 3.  Professor Kutler "plan[s] to research Vice President Cheney's advocacy of something he calls the 'unitary theory' of our government, one that advances almost unlimited and unchecked power for the Executive." *Id.* ¶ 6.  As part of this research, he intends to review the Vice President's "emails with his staff and his other papers," which "are crucial to understanding the unitary theory." *Id.*  Without these records, Professor Kutler believes it "may well prove impossible . . . to give a full scholarly account" and he "will be deprived of material critical to [his] research." *Id.* ¶ 7.

The Court finds, as an initial matter, that these allegations are sufficient to establish that Professor Kutler has sought PRA records in the past and unambiguously intends to do so again in the future.  *See Am. Historical Ass'n*, 310 F. Supp. 2d at 228 (finding allegations that the

---

[21] Defendants urge the Court to dismiss any of the Plaintiffs found to lack standing, *see* Defs.' Reply at 24-25, but the D.C. Circuit has explained that a court need not find standing for all plaintiffs as long as it has found standing for one.  *See Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1221 (D.C. Cir. 1996).

[22] These works include, among others, *Abuse of Power: The New Nixon Tapes*, a book that made use of President Nixon's audio tapes that were released after Professor Kutler's successful lawsuit against the National Archives for access to them, and *The Wars of Watergate: The Last Crisis of Richard Nixon*.  Am. Compl. ¶ 7.

plaintiffs were "engaged on an ongoing basis in the study of presidential records and the internal workings of the government," and intended to "seek access to future collections of presidential records" was sufficiently unambiguous to raise the possibility of future harm).  There is similarly no question that the destruction of PRA records would cause Professor Kutler injury when he seeks to use them in the future.  *See Fed. Election Comm'n v. Atkins*, 524 U.S. 11, 12 (1989) (an "inability to obtain information . . . that, on respondents' view of the law, the statute requires [be made] public" constitutes injury in fact for standing purposes).  Thus, the narrow question presented by Defendants' argument is whether Professor Kutler's injuries are sufficiently concrete and imminent.  The Court finds that they are so.

Plaintiffs allege that, at the conclusion of this Presidential Administration (January 20, 2009), "Vice President Cheney will take with him as his personal papers or otherwise dispose of a significant percentage of [his] records, including records that pertain to the carrying out of his legislative duties and functions."  Am. Compl. ¶ 41.  Plaintiffs also allege that there is an imminent threat that the Vice President and the OVP may "destroy, transfer, or otherwise dispose of many of the [V]ice [P]resident's records under the theory that they are personal records and therefore not covered by the PRA or subject to any other record keeping law or obligation."  *Id.* ¶ 44.  If these allegations are proven true and records of the Vice President are not preserved, then no speculation is needed to determine what will happen when Professor Kutler seeks to use them in his future research – they will be unavailable.  The Court finds that Professor Kutler does not need to wait until Vice-Presidential records are actually destroyed in order for his claimed injuries to become concrete and imminent.

The two cases on which Defendants principally rely do not suggest a different finding.  In

the first case, *American Historical Association v. National Archives & Records Administration*, 310 F. Supp. 2d 216 (D.D.C. 2004) (Kollar-Kotelly, J.), the plaintiffs challenged an Executive Order that delayed access to President Ronald Reagan's Presidential records and threatened to delay access to future Presidential records. *See* 310 F. Supp. 2d at 222-224. Over the course of the lawsuit, however, President Reagan's records were released to the public. *Id.* at 224. The Court therefore granted the defendants' motion to dismiss based on standing because the plaintiffs had no outstanding requests for documents and it was uncertain as to whether the plaintiffs' future requests would be met with any delays. *Id.* at 228. The Court subsequently reconsidered this decision, however, after plaintiffs submitted new facts to the Court that *did* support a basis to find standing – a fact that Defendants fail to acknowledge in their Motion. *See Am. Historical Ass'n v. Nat'l Archives & Records Admin.*, 402 F. Supp. 2d 171, 179 (D.D.C. 2005). In any event, the Court's initial dismissal in *American Historical Association* provides no support for Defendants' position here because, unlike the uncertainty surrounding future events in that case, it is certain what will occur when Professor Kutler seeks access to documents that have not been preserved under the PRA – they will be unavailable to him.

The other case on which Defendants place substantial reliance, *CREW v. Department of Homeland Security*, 527 F. Supp. 2d 101 (D.D.C. 2007), is farther afield. In that case, the court found that the plaintiff's claims were too speculative because the plaintiff failed to allege that "it intends to file a specific FOIA request with the [defendant] for [the records at issue] in the near future." *Id.* at 106. Here, in contrast, Professor Kutler confirmed that he "plan[s] to research Vice President Cheney's advocacy of something he calls the 'unitary theory' of our government," using Vice-Presidential records that he believes are "crucial" to his research on the subject. Decl.

of S. Kutler ¶¶ 6, 7.  Accordingly, there is a sufficient record for the Court to find that Professor

Kutler's claims are based on an imminent injury in fact.  *See CREW v. EOP*, No. 07-1707, 2008

U.S. Dist. LEXIS 99511, at *29 - *32 (D.D.C. Nov. 10, 2008) ("plaintiffs allege that unless the

deleted [records] are restored under [the] FRA enforcement scheme, they will not be able to

obtain these federal records through their pending and *future* requests and therefore suffer real

injury") (emphasis added); *Public Citizens v. Carlin*, 2 F. Supp. 2d 1, 6 (D.D.C. 1997) (finding a

sufficient injury-in-fact where plaintiffs who filed "FOIA requests for electronic documents in

the past and intend to request records in electronic form in the future . . . have demonstrated

through their declarations that they face a real risk that records will not be available to them in

electronic form"), *rev'd on other grounds*, 184 F.3d 900 (D.C. Cir. 1999).

     Defendants' other arguments relating to Plaintiffs' injuries-in-fact do not require

extended discussion.  Defendants argue that Plaintiffs' injuries are speculative because none of

the Plaintiffs "alleges that it has ever filed a FOIA request for vice presidential records from past

administrations . . . ."  Defs.' Mot. at 29.  This argument is misguided because Plaintiffs have

identified multiple instances where they have accessed Vice-Presidential records and there is no

requirement that they do so through FOIA.  *See, e.g.*, Decl. of S. Kutler ¶ 3 (describing his

previous use of Presidential and Vice-Presidential records); Pls.' Opp'n, Ex. 2 ¶¶ 5-6 (Decl. of

Anna Kasten Nelson) (describing her access to Vice-Presidential records through the "Mandatory

Review" process in place prior to the enactment of the PRA).

     Defendants also argue that Plaintiffs lack injury-in-fact because Defendants have, in fact,

complied with the PRA.  *See* Defs.' Mot. at 29-35.  Defendants' argument relies on the parties'

discovery in this case and requires an assessment of the seminal question to be resolved on the

merits by the parties' Cross-Motions for Summary Judgment.  The Court declines to resolve the

seminal question in this case in the context of standing.  "[T]hough the trial court may rule on

disputed jurisdictional facts at any time, if they are inextricably intertwined with the merits of the

case it should usually defer its jurisdictional decision until the merits are heard."  *Herbert v. Nat'l*

*Acad. of Sciences*, 974 F.2d 192, 198 (D.C. Cir. 1992).

Accordingly, the Court finds that Plaintiffs have alleged an injury-in-fact that is

sufficiently imminent and not speculative.  The Court shall therefore proceed to discuss

Defendants' remaining arguments concerning Plaintiffs' standing.

## ii.  Traceability and Redressability

Defendants' Motion to Dismiss argues that Plaintiffs' injuries are not fairly traceable to

any alleged actions by the Archivist, NARA, or the EOP, and that the relief Plaintiffs seek is not

redressable by any claim against those Defendants.  *See* Defs.' Mot. at 36.  As set forth above,

the Court has already dismissed Plaintiffs' claims against the Archivist and NARA based on

redressability.  Thus, the remaining issue is whether Plaintiffs' injuries are traceable to the

actions of the EOP and whether their injuries may be redressed by the EOP.

Plaintiffs, however, failed to respond to this argument in either their Opposition or Reply.

*See* Pls.' Opp'n at 33-34 (addressing Defendants' argument concerning redressability only as it

relates to the Archivist and NARA); Pls.' Reply at 22 (same).  In this district, it is well-

established that the failure to respond to an argument in a Motion to Dismiss acts as a

concession.  *See Fox v. Am. Airlines, Inc.*, 295 F. Supp. 2d 56, 58 (D.D.C. 2003).  Even without

this concession, however, Plaintiffs bear the burden of establishing standing for each of their

claims.  *Lujan*, 504 U.S. at 561.  Plaintiffs' Amended Complaint and briefing fail to explain how

the EOP's actions have caused their injuries and how the EOP may redress them.  Similar to the

analysis above relating to the Archivist and NARA, Plaintiffs point to no authority demonstrating

that the EOP oversees the document classification decisions of the Vice President and the OVP.

Without such a showing, Plaintiffs cannot meet their burden of establishing standing against the

EOP.  Accordingly, the Court shall grant Defendants' Motion to Dismiss Counts I and II against

the EOP under Federal Rule of Civil Procedure 12(b)(1).[23]

       B.      *The Parties' Cross-Motions for Summary Judgment*

Based on the resolution of Defendants' Motion to Dismiss, Plaintiffs' remaining claims

are Count I (declaratory judgment) and Count II (mandamus) against the Vice President and the

OVP.  Defendants move for summary judgment on these claims based on the declarations and

deposition testimony in the record that, according to Defendants, establish that they have not

implemented any guidelines that exclude Vice-Presidential records from the scope of the PRA.

*See* Defs.' Mot. at 38-39.  Plaintiffs also move for summary judgment, arguing that the Vice

President and the OVP are applying a facially under-inclusive definition of Vice-Presidential

Records.  *See* Pls.' Opp'n at 36.

Plaintiffs' reference to a "facially under-inclusive definition of Vice-Presidential records"

is based on the declarations of Claire O'Donnell that Defendants submitted in response to

---

[23] The Court notes that Defendants also argue that Plaintiffs lack prudential standing to pursue their *APA claims*.  *See* Defs.' Mot. at 38.  Because Plaintiffs APA claims have all been dismissed by the Court, this argument is moot.  In any event, even if Defendants raised it as to Plaintiffs' remaining claims, it would fail.  The PRA was enacted to protect the interests of individuals and entities such as Plaintiffs in this case.  *See Armstrong I*, 924 F.2d at 287 ("[w]e find that the statutory language and legislative history of both statutes indicate that one of the reasons that Congress mandated the creation and preservation of federal and presidential records was to ensure that private researchers and historians would have access to the documentary history of the federal government").

Plaintiffs' Motion for a Preliminary Injunction and subsequent related briefing. *Id.*  As discussed above, Ms. O'Donnell's initial Declaration defined "Vice-Presidential records" by referencing the definition set forth in the PRA (*i.e.*, Vice-Presidential records consist of documentary materials related to "the constitutional, statutory, or other official or ceremonial duties of the Vice President").  *See* O'Donnell Decl. ¶ 5.  Ms. O'Donnell then introduced a significant amount of confusion into this case by including two "sub-definitions" that appeared to narrow the PRA's definition of "Vice-Presidential records," stating that "[t]he constitutional, statutory, or other official or ceremonial duties of the Vice President include both the functions of the Vice President as President of the Senate and the functions of the Vice President specially assigned to the Vice President by the President in the discharge of executive duties and responsibilities."  *Id.* The introduction of these two sub-definitions led to numerous rounds of briefing and the granting of discovery to clarify whether Defendants were, in fact, limiting the scope of Vice-Presidential records subject to the PRA.

Defendants contend that Ms. O'Donnell's deposition testimony confirms that Defendants are, in fact, not narrowing the scope of their PRA preservation obligations despite the use of these sub-definitions in Ms. O'Donnell's declaration.  *See* Defs.' Reply at 27-31.  In particular, Ms. O'Donnell testified that she understands *all* of the Vice President's functions to fall within his (1) duties as President of the Senate, or his (2) functions specially assigned by the President in the discharge of executive duties and responsibilities:

> Q: Is it your understanding that everything that the Vice President does in his executive capacity is specially assigned by the President?
> A: In general terms and in specific terms, yes.  It's all – they are all assigned by the President.
> Q: And would your answer – does the Vice President, to your knowledge, have any obligations or responsibilities beyond those that are specially assigned by the

President . . .?
A: He has got his legislative duties as President of the Senate.

* * *

Q: Okay.  And are there any other responsibilities that he has?
A: Everything would fall under those two categories [executive functions assigned by the President and legislative functions], everything else he does.

O'Donnell Depo. Tr. at 83:18 - 84:19.[24]

Ms. O'Donnell also testified–repeatedly–that Defendants are, in fact, preserving all of the

Vice President's records, regardless of whether a particular record facially appears to be

encompassed by either of the two "sub-definitions" in her declaration:

Q: And what is your understanding of the documents that the Vice President is required to transfer to NARA at the end of his administration?
A: All of his executive and legislative files.

Id. at 37:15 - 38:1.

Q: How are the legislative records of the Vice President treated under the Presidential Records Act?
A: The same as the executive records are kept.  Everything is considered a document that has to be kept and filed.

Id. at 61:17 - 61:22.

Q: Okay.  By statute the Vice President is included in the Smithsonian Institution . . . Given that that's a responsibility assigned to the Vice President by statute, how is it, how does it fit within your language specially assigned by the President?
A: Again, if he is – I don't get into the legalese.  If there are documents created or received on behalf of his duties, and if he sits on that board because he is Vice President, then we would consider it a Presidential document.
Q: The Vice President also is a member of the National Security Council . . . If that is a responsibility that the Vice president has because it's been assigned to him by Congress, how can it at the same time be specially assigned by the

---

[24] Ms. O'Donnell's deposition transcript is attached to Defendants' Motion for Summary Judgment as Exhibit 2, and attached to Plaintiffs' Motion for Summary Judgment as Exhibit 1. For ease of reference, the Court shall cite directly to the deposition transcript.

President?

A: They are part of his executive duties and . . . [t]hey are Vice Presidential documents that we keep for the Presidential Records Act.

*Id.* at 78:1 - 79:2.

Q: Okay.  Will all of the papers, records, notes, recordings, memos, that the Vice President has created since January 20, 2001, be included as Vice Presidential materials turned over to NARA under the Presidential Records Act?

A: Those are the intentions that I've been made aware of.  Those are his [the Vice President's] intentions.

*Id.* at 87:21 - 88:6.

A: The general guidance [is] . . . any document that is created or received in our capacities to support the Vice President and in his capacity and his executive responsibilities, would be covered under the PRA.

*Id.* at 130:1 - 130:5.

Plaintiffs fail to provide the Court with any contrary *evidence* in the record, relying instead on Ms. O'Donnell's initially confusing declaration to support their Motion for Summary Judgment.  At this stage of the litigation, however, Plaintiffs "must present affirmative evidence," *Anderson v. Liberty Lobby*, 477 U.S. 242, 256-57 (1986), and cannot rely on "allegations or conclusory statements," *see Prince v. Rice*, 570 F. Supp. 2d 123, 133 (D.D.C. 2008).  Although Plaintiffs are correct that Ms. O'Donnell's earlier declarations led to much confusion in this case, that confusion is not *evidence* that undermines Ms. O'Donnell's testimony that Defendants preserve all Vice-Presidential records as required by the PRA.  In the absence of any contrary evidence and authority, the Court has no basis to find otherwise.

The only other support for their motion that Plaintiffs offer is an attack on Ms. O'Donnell's qualifications to testify to the matters included in her declarations and deposition.  *See* Pls.' Opp'n at 37-41.  For example, Plaintiffs argue that "Ms. O'Donnell's deposition

59

testimony reveals she was not a competent witness to testify regarding the meaning of the phrase 'specially assigned' or any of the other matters to which she attested in the three declarations she submitted in this lawsuit." *Id.* at 37.  Plaintiffs also emphasize that Ms. O'Donnell was unaware of the October 8, 2008 memorandum that described the preservation of Vice-Presidential records under the PRA.  *Id.* at 38.  The Court is unpersuaded.

Ms. O'Donnell's deposition testimony revealed that she had personal knowledge of Defendants' PRA guidelines and policies (the focus of Plaintiffs' remaining claims in this case), had received training related to the same, and was even responsible for advising other persons in the OVP as to Defendants' PRA guidelines:

> Q: Do you have responsibility for records management within the Office of the Vice President?
> A: Yes.

O'Donnell Depo. Tr. at 19:18 - 19:20.

> Q: Have you received any training specifically on records management since coming to the OVP?
> A: Yes.
> Q: And describe for me what that training has been.
> A: It was a memo that we received when we came on board and we have been reminded on a regular basis verbally and in ethics briefings.

*Id.* at 21:13 - 21:21.

> Q: Okay.  But with respect to the implementation of that guidance, what knowledge do you have?
> A: Just as kind of the overall person responsible for making sure people are keeping all their files . . .
> Q: . . . Is that part of your responsibilities for the entirety of the OVP?
> A: In general, yes.

*Id.* at 96:5 - 96:14.

Ms. O'Donnell also explained that, while she does not understand the *legal* significance

of the phrase "specially assigned," it was *not* used to narrow the scope of documents preserved

under the PRA:

> Q: To your knowledge, is this specific definition, the specific specially assigned language
> reflected in any record-keeping guidance that you have seen . . .?
>
> * * *
>
> A: No.  It is not.

*Id.* at 70:13 - 71:3.

> A: The general guidance [is] . . . any document that is created or received in our
> capacities to support the Vice President and in his capacity and his executive
> responsibilities, would be covered under the PRA.
> Q: And when you say general guidance, you are referring to [a] memoranda [that] you've
> identified?
> A: Correct.
> Q: And whatever other oral guidance you have been given?
> A: That's correct.

*Id.* at 130:1 - 130:11.

The mere fact that Ms. O'Donnell was unaware of one particular memorandum that

described the preservation of Vice-Presidential records does not undermine her ability to testify

to the matters set forth above.  Moreover, even though Plaintiffs suggest Ms. O'Donnell lacked

personal knowledge about how certain records were "create[d] or maintain[ed]," Pls.' Opp'n at

39, such knowledge is foreclosed from judicial review, *see Armstrong II*, 1 F.3d at 1294

(foreclosing judicial review of creation, management, and disposal decisions), and such

knowledge also is unrelated to Plaintiffs' remaining claims in this case, *id.* at 2 (stating that

Plaintiffs do not seek review of the Vice President's "day-to-day record management practices

and decisions," but seek review of "policies and guidelines").  Signficantly, Plaintiffs fail to

identify any instance where Ms. O'Donnell was unable to testify about the *guidelines* Defendants

use to preserve Vice-Presidential records under the PRA.

At bottom, Plaintiffs have failed to contradict the evidence Defendants identify to support their Motion for Summary Judgment, and have failed to adduce their own evidence supporting the remaining claim against the Vice President and the OVP.  Accordingly, based on Defendants' unrebutted evidence, including the testimony in this case, the Court is compelled to enter summary judgment in favor of Defendants and against Plaintiffs.

One final issue merits discussion.  Plaintiffs confirmed in discovery that the Archivist and NARA have not made a final determination as to whether or not the Vice President's legislative records might be "personal" records that need not be preserved under the PRA:

> Q:  Okay.  My questions go, if you can answer them, to whether or not . . . NARA has taken a final position on the status of records that a Vice President creates when he fulfills his Constitutionally assigned responsibilities as President of the Senate.
> A: I am not aware that we have taken a final position on that issue.

Pls.' Opp'n, Ex. 4 at 36:14 - 37:20 (Depo. Tr. of Nancy Kegan Smith).

This position appears to conflict with the PRA's definition of Vice-Presidential records, which includes records relating to the Vice President's *constitutional*, statutory, or other official or ceremonial duties.  *See* 44 U.S.C. § 2201.  Nevertheless, Plaintiffs' claims against the Archivist and NARA were dismissed above because Congress did not provide any authority in the PRA that allows the Archivist or NARA to affect the Vice President's guidelines implementing his preservation obligations.  *See* Section III.A.3, *supra.*  The Court nevertheless notes that Defendants have conceded their obligation to preserve these legislative records, and indicate that they have done so:

> A: My final understanding is that legislative records are being treated under the Presidential Records Act as OVP records.

Pls.' Opp'n, Ex. 4 at 41:5 - 41:7 (Depo. Tr. of Nancy Kegan Smith)

> Q: How are the legislative records of the Vice President treated under the
> Presidential Records Act?
> A: The same as the executive records are kept.  Everything is considered a
> document that has to be kept and filed.

O'Donnell Depo. Tr. at 61:17 - 61:22.  Accordingly, the Court expects that all of the Defendants

will, in good faith, comply with the representations that their officials have made, by way of

testimony, in this case.

## IV.  CONCLUSION

For the reasons set forth above, the Court shall GRANT-IN-PART and DENY-IN-PART

Defendants' Motion to Dismiss, GRANT Defendants' Motion for Summary Judgment, and

DENY Plaintiffs' Cross-Motion for Summary Judgment.  The Preliminary Injunction issued by

the Court on September 20, 2008, shall be VACATED, and Defendants' Motion to Reconsider

the Court's entry of a Preliminary Injunction shall be DENIED AS MOOT.  An appropriate

Order accompanies this Memorandum Opinion.

Date: January 19, 2009

_____/s/_____

**COLLEEN KOLLAR-KOTELLY**
United States District Judge
